■   THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v PAUL P. RAO, PAUL P. RAO, JR., and SALVATORE NIGRONE, Respondents.—Appeal by the People from an order of the Extraordinary Special and Trial Term of the Supreme Court, Kings County, dated December 8, 1975, which dismissed three indictments (one as to each defendant) charging defendants with various counts of perjury in the first degree. Order reversed, on the law, and indictments reinstated; matter remitted to the Justice presiding at the Extraordinary Special and Trial Term for a *de novo* determination of the pending motion in accordance herewith. In May, 1974 a Grand Jury empaneled for an Extraordinary Special and Trial Term of the Supreme Court indicted defendants Paul P. Rao, Paul P. Rao, Jr., and Salvatore Nigrone, charging them with the commission of various counts of perjury in the first degree. Thereafter, the Raos moved in this court for the dismissal of their respective indictments and Nigrone separately brought a proceeding pursuant to CPLR article 78 in the nature of prohibition, in which he also sought dismissal of his indictment. Permission for the making of such motions by the Raos and Nigrone was granted by a Justice of this court pursuant to subdivision 2 of section 149 of the Judiciary Law. Dismissal of the indictments was sought primarily upon the ground of prosecutorial misconduct and in the interest of justice, and was premised upon the Special Prosecutor's conceded actions in setting up a simulated robbery and causing fictitious testimony to be presented under oath before a regular Grand Jury, which returned a robbery indictment in the fabricated criminal matter (the so-called Vitale case). This court unanimously condemned the Special Prosecutor's misconduct but, with two Justices dissenting, upheld the perjury indictments handed down by the Special Extraordinary Grand Jury. Neither Rao challenged the legal sufficiency of the evidence before the Extraordinary Grand Jury, and so we expressed no view with respect thereto. Defendant Nigrone did raise such an issue in connection with his claim that his Grand Jury testimony was not, in essence, perjurious. (Specifically, Nigrone argued that although he had denied having asked defendant Rao, Jr., whether the "hook was in", he did tell the Grand Jury, in substance, that he had asked Rao, Jr., whether he had done anything wrong in connection with the Vitale case, which testimony allegedly amounted to the same thing.) We found the evidence sufficient to warrant denial of his dismissal motion. Defendant Nigrone appealed to the Court of Appeals, which affirmed the dismissal of his article 78 proceeding on the ground such proceeding was unavailable to resolve the prosecutorial misconduct dispute, which related to antecedent facts, collateral to and outside of the pending criminal action. The Court of Appeals also dismissed the appeal from our denial of his motion to dismiss, finding that determination not to be separately appealable (see *Matter of Nigrone v Murtagh,* 46 AD2d 343, affd 36 NY2d 421). Thereafter, and in May, 1975, defendant Nigrone made an omnibus motion at the Extraordinary Special and Trial Term. The relief sought included, *inter alia,* a bill of particulars; discovery and inspection of

numerous items, with a reservation of rights to move for further relief once those items had been furnished; and dismissal of the indictment for defects on its face, defects in the Grand Jury proceeding, legally insufficient evidence, and in the interest of justice. A motion for inspection of the Grand Jury minutes accompanied the motion to dismiss for legal insufficiency, as required by CPL 210.30 (subd 1). In addition, defendant Nigrone again challenged the conduct of the Special Prosecutor in setting up the fake Vitale robbery case, which prosecutorial misconduct claim formed the basis of his request for dismissal of the indictment in the interest of justice. The Raos made no motions at Extraordinary Term, pursuing instead a suit in Federal court to enjoin their prosecution. The Special Prosecutor's time to answer Nigrone's omnibus motion was extended, by agreement of the respective counsel, pending the determination of the Raos' Federal suit. On September 30, 1975 that suit was dismissed in the District Court for the Southern District of New York. When the Raos appealed to the Second Circuit Court of Appeals, the Special Prosecutor's time to answer was again extended by agreement of counsel. It appears that the Justice presiding at said Extraordinary Term, the late Mr. Justice Murtagh, was not a party to and had never approved the agreements extending the prosecutor's time to answer. On November 24, 1975, after being notified of the further extension of time agreed upon, Mr. Justice Murtagh granted so much of defendant Nigrone's omnibus motion as sought inspection of the Grand Jury minutes, and proceeded to consider the validity of the evidence before the Grand Jury. The Special Prosecutor was notified of this by Justice Murtagh and, allegedly, was given 30 days in which to submit an answer. However, on December 2, 1975, Mr. Justice Murtagh handed down his decision dismissing not only the indictment against Nigrone, but those against the defendants Rao as well. Mr. Justice Murtagh's decision indicates that he found the evidence presented to the Grand Jury to be violative of the rules of evidence and highly prejudicial to the defendants. More particularly, he cited as incompetent or violative of the rules of evidence the fact that the under-cover agents testifying against the defendants herein gave only "yes" or "no" answers to leading questions by the Assistant Special Prosecutor, and were permitted to give opinion testimony as to the truth or falsity of the defendants' alleged false statements; that the tape recordings of the conversations to which the witnesses testified were not properly authenticated and the transcripts thereof were permitted to be used by the Grand Jury without first complying with the procedures set forth in *People v Feld* (305 NY 322); and that the Assistant Special Prosecutor read transcripts to the Grand Jury on two occasions without permitting it to hear the tape recording, ascribed the voices on the tapes to one or another of the defendants on several occasions, and failed to authenticate minutes of an alleged proceeding in "Brooklyn Criminal Court". The decision concludes: "The Court on its own motion and in the interests of justice is constrained, pursuant to Section 210.40 of the Criminal Procedure Law, to dismiss all counts of the three indictments." The dismissal of the indictments "in the interest of justice" pursuant to CPL 210.40 was improper. The motion papers and Mr. Justice Murtagh's decision demonstrate, beyond peradventure, that these indictments were dismissed not "in furtherance of justice" pursuant to CPL 210.40, which empowers the court to order termination of a defendant's prosecution for reasons having little or nothing to do with the legal or factual merits of the charge or the guilt or innocence of the defendant (see *People v Quill,* 11 Misc 2d 512, 513), but rather for an allegedly defective Grand Jury proceeding, pursuant to CPL 210.35 (subd 5),

or alleged legal insufficiency, pursuant to CPL 210.30. Although the former —interests of justice—disposition may be made *sua sponte* (see CPL 210.40, subd 2), the latter dispositions may not (see CPL 210.45, subd 1). A motion to dismiss, in writing and upon reasonable notice to the People, is necessary in such cases (see *People v Pichkur*, 52 AD2d 852; *People v Trottie*, 47 AD2d 751). No such motion, or even one to simply inspect the Grand Jury minutes, was ever made by the defendants Rao. Furthermore, under the circumstances presented, including the consent of defendant Nigrone's counsel to extensions of the Special Prosecutor's time to answer the voluminous motion, the court's apparent failure to honor the 30-day deadline it subsequently set for submission of an answer unfairly deprived the prosecutor of his right to answer Nigrone's motion. Finally, even assuming, *arguendo,* that the dismissal of the indictments was premised solely upon the interest of justice, the court erred in not giving fair notice of its intentions to the parties and holding a hearing at which all pertinent considerations might have been explored (see *People v Clayton,* 41 AD2d 204, 207–208). The order must, therefore, be reversed and the indictments reinstated. We have remitted the entire matter to the Justice presiding at the Extraordinary Special and Trial Term for a determination, on the merits, of the pending motion by defendant Nigrone. We express no view as to the merits of any particular branch of his motion, or any possible disposition, and leave the decision as to whether a hearing is warranted on any aspect thereof to the sound discretion of the Justice presiding. Latham, Acting P. J., Cohalan and Rabin, JJ., concur; Shapiro, J., concurs in the result, with the following memorandum: Without withdrawing in any way from the views expressed in my dissent in *People v Rao* (46 AD2d 343), but solely on constraint of the majority holding in that case, the correctness of which has not been passed upon by the Court of Appeals for jurisdictional reasons (see 36 NY2d 421), I most reluctantly concur for reversal. My reluctance is not only based upon the views expressed by me in my dissent, but also upon the outrageous manner in which this case was presented to the Grand Jury. Upon the argument of this appeal I stated that a reading of the Grand Jury minutes clearly established that this had been a "sloppy" presentation. The Special Prosecutor refused to accept my terminology, but conceded that this was indeed a "loose" presentation. As the dissent of Mr. Justice Titone points out, it was more than that, for in many instances it violated every standard of proper Grand Jury presentation and the resulting indictments may well have been handed up by reason of the improper legal advice given to the Grand Jury and the unprofessional manner in which the facts were presented to it. I find myself, however, compelled to concur with the majority in order to afford the prosecution an opportunity to be heard. In taking his oath of office, the Honorable John F. Keenan, the new Special Prosecutor, said that while "extremism in the pursuit of liberty is no vice, I subscribe to the theory that extremism that tramples on liberty is no virtue" (NYLJ, July 1, 1976, p 1, col 2). I am confident that a courageous re-evaluation by the Special Prosecutor of the proceedings leading to the indictments will indicate to him, as they have to me, that they were secured by means abhorrent to those of us who believe that the Constitution was meant to be obeyed not only by ordinary citizens, but by prosecutors as well, and that therefore they should no longer be "permitted to befoul the records of our courts" (see my dissent in *People v Rao,* 46 AD2d 343, 358, *supra).* Titone, J., dissents and votes to affirm the order with the following memorandum: In prior litigation *(Matter of Nigrone v Murtagh,* 46 AD2d 343, affd 36 NY2d 421), which may be referred to as "Vitale I", this court unanimously

condemned the Special Prosecutor for abusing and perverting the criminal process by making a regular Kings County Grand Jury, and numerous Criminal Court Judges and Supreme Court Justices, unwitting dupes in the Vitale robbery charade. Here, in the sequel, "Vitale II", we are concerned with the integrity of the subsequent Extraordinary Grand Jury proceeding as it relates to the evidence and legal instructions underlying the indictment of the defendants for perjury, and also, the tactics and techniques used by the Special Prosecutor's office in presenting the defendants' cases to that body. I find that the perversion of the criminal justice system by an overzealous prosecutor, which this court condemned in "Vitale I", is continued, exacerbated, and magnified in "Vitale II". The majority of this court chooses to reverse the orders dismissing these indictments solely on procedural grounds. I respectfully disagree. In my opinion, Extraordinary Term's determination was procedurally proper, and the appeal should be decided by this court on the merits. After reading the Grand Jury minutes one must totally agree with the late Mr. Justice Murtagh's decision that all indictments should be quashed. One branch of defendant Nigrone's omnibus motion for relief was for inspection of the Grand Jury minutes, and it is this request which Extraordinary Term granted on November 24, 1975, and which the Special Prosecutor does not question on appeal. As I will discuss in great detail later in this opinion, the ruling to inspect, the subsequent examination of the minutes, and the ensuing determination to dismiss, were all procedurally proper, not only as to defendant Nigrone, who made the motion, but also as to defendants Rao, who did not. The essence of the criminal justice system lies in its role as an impartial arbiter, exercising its judgment, for the most part, after law enforcement authorities have completed their functions of detecting crime and apprehending the alleged criminals. The Grand Jury has for centuries functioned as the protector of citizens against arbitrary and oppressive governmental action (see *United States v Calandra,* 414 US 338, 343). It "had its origin at a time when there raged a fierce conflict between the rights of the subject and the power of the crown. It was established to secure to the subject a right to appeal to his peers, under the immunity of secrecy and irresponsibility, before the government could bring him to trial. It was a right wrung from the government to secure the subject against oppression" *(People v Naughton,* 7 Abb Prac [NS] 421, 426; 38 How Prac 430, 437–438). The Grand Jury is an "arm of the court" *(Matter of Spector v Allen,* 281 NY 251, 260), and hence the courts have a particular responsibility to prevent unfairness in Grand Jury proceedings *(People v Ianniello,* 21 NY2d 418, 424). It is the exclusive judge of the facts with respect to any matter before it (CPL 190.25, subd 5). The court, and especially the prosecutor, are merely its legal advisors (CPL 190.25, subd 6). The prosecutor may, of course, question witnesses and present any other pertinent evidence, and he may thereafter review the evidence and relate it to the applicable law. However, he must refrain from using even the slightest coercion on that body and make every effort to provide a fair inquest *(United States v Rintelen,* 235 F 787, 794). Essentially then, the role of the prosecutor before the Grand Jury is three-fold. He is, of course, the public prosecutor, presenting the evidence which amounts to the People's case. Mainly, the evidence presented to the Grand Jury is the direct case ultimately presented to a trial jury. Secondly, the prosecutor before the Grand Jury is the Judge. He is obligated to rule on the competency of evidence and of the witnesses. He charges the Grand Jury as to questions of credibility, sufficiency, burden of proof and the like. He has an obligation to give any charge that a Judge would be obligated to give at a

trial. Thirdly, and most important, the prosecutor's role is to assist and advise the Grand Jury. He must make a good-faith effort to insure that what the Grand Jury hears is competent evidence. The prosecutor should never permit the Grand Jury to believe that he is vouching for the credibility of a witness and he should strongly advise that body that the evidence is legally insufficient and incompetent where it is. Lastly, he should always satisfy himself that the Grand Jury is acting freely, without any coercion from him or from any other source. Turning now to the merits of the dismissals herein, examination of the Grand Jury minutes at bar clearly demonstrates that the Special Prosecutor's office did not even pay lip-service to the principles upon which the Grand Jury was founded, namely, to protect the citizen against arbitrary and oppressive governmental action, and to secure his right of appeal to his peers before the government could bring him to trial. Nor did such office even make a token attempt to carry out its three-fold role as public prosecutor, Judge, and legal advisor in a responsible and fair manner. The contents of the minutes fully support the findings of Mr. Justice Murtagh as to the plethora of incompetent and inadmissible evidence adduced by means of leading questions and opinion testimony. They also justify his conclusions that transcripts of tapes were read to the members of the Grand Jury without permitting them to hear the tapes, the tapes were not properly authenticated, the assistant special prosecutors who conducted the proceeding erroneously participated in the Grand Jury's deliberations and they committed other prejudicial errors. In addition, the minutes also demonstrate, *inter alia,* that the same prosecutors made false and highly prejudicial statements before the body, presented a doctored transcript of a tape, and gave patently prejudicial and erroneous instructions. I will now elaborate on both the findings of Mr. Justice Murtagh and my own. (The underscoring hereafter when quoting from the Grand Jury minutes is supplied for emphasis.)

### TESTIMONY ADDUCED FROM LEADING QUESTIONS

The testimony of the two principal witnesses for the prosecution (Loretta Errico and Stephen Wilkowski [Vitale]) as to the part they played in the bogus Vitale case, are encompassed in 61 pages of the minutes. All such testimony set forth in those 61 pages was elicited by means of leading questions. The following are portions of such testimony, taken verbatim from the transcript: (Questioning of Loretta Errico) "Q Pursuant to this investigation, were you told about a robbery case concerning an individual identified to you at that time as Stephen Vitale? A Yes. Q Were you told, concerning this robbery case, that there was a problem with the bail, and that $10,000 in cash had been set as bail? A Yes, I was told that. Q Were you told that this money was posted and given in to the court? A Yes. Q Now, were you also told concerning this case involving Vitale that the state judge on the Vitale matter had indicated an interest in asking questions about the source of the bail money? A Yes, I was told that. Q Were you told that the source of this bail money was not desired to be disclosed to the Court at that time? A Yes. * * * Q Did you tell Judge Rao that there was a state judge who was going to ask about this $10,000 in cash? A Yes Q Did you tell Judge Rao that what you wanted was to prevent this state judge in the Vitale case from inquiring as to the source of the bail? A Yes, I did tell him that. * * * Q Did Judge Rao advise you on how to handle this problem? A He did. Q Did he advise you that the way to handle this problem in affecting the actions of this state judge in the Vitale case could be handled by getting a lawyer that knew the judge? A Yes, he told me that. * * * Q

Mrs. Errico, before we play the tape, again, this is a tape of the conversation between you and Judge Rao, and it is your testimony, is it not, that during this conversation Judge Rao asked you what your problem was, and that you told him that you knew this man Vitale, that he was involved in a robbery, that there was $10,000 in cash posted as bail, that there were hidden funds involved, and that the state judge had indicated an interest in asking where this bail money came from, and that you went to Judge Rao to request his intercession to prevent the judge from asking these questions; is that correct? A Yes, it is correct. Q And that Judge Rao advised you that the way to handle this problem was to get a lawyer that knew the judge; is that correct? A Yes, it is. That's what he said. Q And then he sent you to his son, Paul Rao, Jr., in substance, because they would know his son's name or know himself; is that correct? A Yes, that is. * * * Q In substance, Mrs. Errico, did Paul Rao, Jr., tell you at that time that he knew that his father had sent you to him because he knew the right people? A That's what Paulie told me. Q Did Paul Rao, Jr., tell you that he would see these people to take care of the Vitale case, and that he would let you know how much it would cost over his legal fee to take care of the case? A Yes, that's what he said, that he would let me know exactly how much it would cost over the fee to take care of the case. * * * Q When you spoke to Rao on March 14th, did he tell you that Vitale would have testified in his defense that the robbery victim was a homosexual or tried to molest Vitale? A Yes, he told me something about a fagot. I don't know. (Questioning of Stephen Wilkowski [Vitale]) Q Now Officer Wilkowski, on November 12, 1973—that's the same day that Mrs. Errico met with Judge Rao—did you meet with attorney Paul Rao, Jr., at his law office? A Yes, I did. * * * Q During that meeting, did you inform him that you were charged with robbery and as a result of that charge $10,000 in cash was posted as bail? A Yes. * * * Q And did you tell him that to make bail your girlfriend went to your partner, who had committed the crime with you, and took the $8,200 from the robbery, and together with $1,800 of yours, posted the $10,000 cash bail? A Yes. * * * Q Did Rao tell you that if you were not going to blow the $10,000, you would have to explain the source of the bail in a way so that it would not be connected with the robbery? A Yes, that's correct. * * * Q And you testified that upon going to court, that Mr. Rao excused himself, told you that he had to see some people, and subsequently he told you that a judge had given him some advice as to how to protect the bail money; is that correct? A Yes, that's correct. * * * Q Is it correct that Mr. Rao represented to the Court that the money that was posted as bail came from the savings of your mother and father and not from the robbery? A Yes, that's correct. * * * Q Officer, was it, in fact, a practice of Rao for him to feed you leading questions that would suggest answers for you to give in developing this false defense story? A Yes, that was his practice. * * * Q Did Rao castigate you for not bringing him more money? A He most certainly did. * * * Q However, on the issue of your case, Mr. Rao said that he was keeping appointments and seeing people; is that correct? A Yes. Q But when you asked him for a clear commitment, he said that he hadn't been seeing people; is that correct? A Yes. Q Officer Wilkowski, in fact, at some time subsequent to Mr. Rao telling you that there were people in Brooklyn that could squash your case, and that he would have to see people or you would blow your bail, the bail money, is it not a fact that despite that fact that you had not appeared at one time in court, and despite the fact that it was believed that you had a prior record, and that you were charged with robbery, the robbery of $8,200, that bail was reduced in this case? A Yes it

was." The above-quoted excerpts so amply justify the statement of Mr. Justice Murtagh that the "answers of the witnesses were made exclusively pursuant to entirely leading questions by an assistant special prosecutor and consisted of mere affirmations or denials", that any lengthy discussion or comment with respect thereto would only belabor the obvious. In my opinion, such total and purposeful violation of a most basic rule of evidence so taints the Grand Jury proceeding that the indictments should not be allowed to stand, assuming that competent evidence might somehow be found in the minutes to sustain any of the counts. The exclusive use of leading questions to elicit mere affirmances and denials from the prosecution's chief witnesses not only makes a mockery of the Grand Jury proceeding itself, but also, if these indictments were allowed to stand, would seriously jeopardize the defendants' rights to a fair trial. One of the fundamental rights that a defendant enjoys at trial is the use of prior statements or testimony of his accusers for purposes of impeachment on cross-examination. Because of this charade, the defendants' rights to use the Grand Jury testimony of their accusers in cross-examination under *People v Rosario* (9 NY2d 286), has been rendered useless. The witnesses cannot be cross-examined in depth as to their versions of the occurrences, since their testimony in that regard amounts to little more than grunts and shrugs of the shoulders. Nor can the Assistant Special Prosecutor be cross-examined, although for all intents and purposes he was an unsworn witness to the alleged happenings. I grant that a prosecutor need not place all of the specific details concerning the commission of a crime before a Grand Jury for the convenience of the defendant on cross-examination at the trial. However, in my opinion a prosecutor may not frustrate such right of impeachment by purposely saturating a Grand Jury record with insufficient and incompetent testimony by his primary witnesses. Permitting such a travesty of justice would afford the People a tactical advantage at the trial based upon its own prior misconduct (see *People v Di Matteo,* 80 Misc 2d 1029, 1031).

### OPINION TESTIMONY

As a further basis for dismissing the indictments, Mr. Justice Murtagh said that, on numerous occasions, the alleged false statements of the defendants were read to the two main witnesses for the prosecution, and then they were asked to give their opinions as to the truth or falsity of those statements. Such conduct is entirely impermissible and violates a most basic rule of judicial procedure. It is elementary that a witness should state facts and not his conclusions or opinions. An ideal witness should confine his statements to simple facts, in logical sequence; facts which come to his knowledge by conscious perception, leaving it to the jury to draw its conclusions (see 1 Bender, New York Evidence, § 35.01). A witness may not testify as to the truth or falsity of another witness where there is a discrepancy between their testimony (23 CJS, Criminal Law, § 878; cf. *People v Jaffee,* 42 AD2d 587). Once again the minutes of the Grand Jury proceeding fully support a finding of Mr. Justice Murtagh, as is demonstrated from the following excerpts taken from the transcript: (Questioning of Loretta Errico) "Q Mrs. Errico, let me read to you a portion of Judge Rao's testimony before this Grand Jury * * * Judge Rao testified: 'She'—meaning you—'sat down. She said, "I want some advice." I said, "I'm sorry, I can't give you any advice * * * It's unethical for me, as a Federal Judge, to do so." ' *Mrs. Errico, is that the truth?* A *It's absolutely false.* * * * 'Q Did you ever advise her on how to handle her problems? [Rao, Sr.] A

Absolutely not. I didn't even know what the problem was. I wasn't interested in it.' *Mrs. Errico, is that the truth?* A That's a falsehood. That is not the truth. * * * 'Q You never told her that she could use the influence of your name? [Rao, Sr.] A Of course not. Q And you have a clear recollection of all these—A Absolutely, No question about it.' *Mrs. Errico, was Judge Rao telling the truth when he testified that he never discussed with you using the influence of his name to influence the judge on the Vitale case?* A *No, he's not telling the truth."* [Emphasis supplied.] (Questioning of Stephen Wilkowski) "Q Now, Officer Wilkowski, let me interrupt for a moment and read a portion of Paul Rao, Jr.'s testimony before this Grand Jury * * * 'Mr. Rao, excuse me. What I am concerned with, No. 1, is at the time you did make a representation to the Court that the money came from the family, as to that first occasion, did you have any reason to believe that the money did not come from the family or came from any other source? A No. When I first made the representation to the Court, the answer is no.' *Officer Wilkowski, is that truthful?* A *No that is not truthful* * * * 'Q Did you ever tell Vitale that you did that? [Rao, Jr.] A I never told Vitale that I ever saw any Judge.' Q *Was that truthful?* A *No, that is not truthful.* * * * 'Q Did you ever tell Vitale that he would have to get money to you so that you would know how to talk to other people? [Rao, Jr.] A No, I never told Vitale that he has to get money to me so I know how to talk to other people, no. No.' Q *Officer Wilkowski, is that truthful?* A *No, that's a lie."* [Emphasis supplied.]

### READING OF TRANSCRIPTS WITHOUT PLAYING TAPES

The minutes of the Grand Jury proceeding reveal, as Mr. Justice Murtagh indicated, that, on at least two occasions, the prosecutor conducting the proceeding read transcripts to the members without permitting them to hear the tapes. This is documented by the following excerpts taken from the Grand Jury minutes: "MR. BROWN: I think this is a very short thing. If you want, you may listen to the tape. *I don't think it's necessary.* Q Let me read to you Officer [Wilkowski], the conversation as it appears on the transcript, and ask you whether that is, in substance, the conversation that you had. * * * MR. BROWN: I believe there is some more. *To expedite things, why don't you just read the transcripts a page or two more, and you will get a very clear picture of what transpired. It would be faster than going through the rest of the tape."* [Emphasis supplied.] Since one of the two tapes was not played, and the other tape only partially played, it follows, for such additional reason, that counts one and five of Paul Rao, Jr.'s indictment, to which those tapes pertain, should be quashed (see *People v Harding,* 44 AD2d 800, 801).

### ASCRIBING RECORDED VOICES TO DEFENDANTS

As Mr. Justice Murtagh also noted, on at least six occasions the prosecutor wrongfully ascribed voices on the tapes or transcripts to defendants Rao, Sr., or Rao, Jr. The following are excerpts from the Grand Jury minutes showing three such occurrences: "MR. BROWN: * * * What I am going to ask Mr. Ruggiero to do is to play a portion of this tape at first, so you can get used to the voices. Judge Rao and Mrs. Errico are talking." * * * "Q Mrs. Errico, before we play the tape, again, this is a tape of a conversation between you and Judge Rao * * * MR. BROWN: * * * This is somewhat of a lengthy tape, and it is a reproduction of Officer Wilkowski's first meeting with Rao, discussing what they would do the following day in court concerning the bail."

### FALSE AND PREJUDICIAL STATEMENTS; DOCTORED TRANSCRIPT OF TAPE

During the questioning of witnesses for the People, the following two questions were asked: "Did you observe Rao talking with someone in the chambers of then suspended Judge Ross DiLorenzo?" and "Was one of the names of judges there indicated the name of then suspended Judge Ross DiLorenzo?" These questions were obviously asked to inflame and prejudice the grand jurors. Even if true, the statements as to Judge Di Lorenzo's status had no relevancy. The fact is that the Special Prosecutor's representative knew at the time that Judge Di Lorenzo had not been suspended, but had been relieved of his judicial duties at his own request. In any event, the prejudicial nature of the questions is patent. A prosecutor should not make statements or arguments in an effort to influence Grand Jury action in a manner which would be impermissible before a petit jury (American Bar Association Project on Standards For Criminal Justice, the Prosecution Function, § 3.5(b); see, also, *Anthony v State* (521 P2d 486, 489 [Alaska]). With respect to the transcript of the tape of an alleged conversation between Rao and Wilkowski (Vitale), which tape was never played, the following is an excerpt from the transcription as it was presented to the members of the Grand Jury (the matter shown in parenthesis is exactly as it appears in such transcript): "Rao: Well it's important that I see you on Friday Vitale: Yeah, yeah Rao: Understand—for this. (Rao motioned money sign with hand) * * * Rao: See, I got news for ya. Don't you think that 5 is worth the protection . . . . . . of the 10 Vitale: Oh yeah, definitely Rao: Well, I mean, ah, I put that here (patting his pocket). But where do you think it's going to stay?" Nowhere in the inadmissible testimony of Wilkowski is there any indication that Rao, Jr., made a "money sign with hand", or went through the motion of "patting his pocket". Nor, to my knowledge, is there any electronic listening device so sophisticated and sensitive that it is able to record such motions. Yet this prejudicial material was placed before the Grand Jury with not a scintilla of evidence to support it. Not only was such evidence totally inadmissible, but I also raise the question as to whether section 215.40 of the Penal Law (tampering with physical evidence) was violated in this instance. Such section provides that a person is guilty of tampering with physical evidence (a class E felony), when: "With intent that it be used or introduced in an official proceeding or a prospective official proceeding, he (a) *knowingly makes, devises or prepares false physical evidence,* or (b) *produces or offers such evidence at such a proceeding knowing it to be false"* (emphasis supplied).

### AUTHENTICATION OF TAPES

As an additional reason for dismissing the indictments, Mr. Justice Murtagh asserted that the tapes of conversations of the defendants were not properly authenticated before being admitted in evidence. The minutes reveal that before the tapes and transcripts were admitted, Loretta Errico, Steven Wilkowski and William Clancy, a special investigator with the office of the Special Prosecutor, were asked, in substance, whether the contents of the tapes were fair and accurate accounts of the conversations recorded, and were also asked to identify the voices recorded on the tapes. In each instance, the witness stated that the contents were fair and accurate accounts and they also identified the voices on the tapes as, *inter alia,* belonging to the defendants. Such procedure does not comply with generally accepted standards which have been fixed by courts for the admission of tape material in evidence. The cases are in general agreement as to what constitutes a proper foundation for the admission of a sound recording. They

indicate a reasonably strict adherence to the rules prescribed for testing the admissibility of recordings. They are (1) a showing that the recording was capable of taking testimony or conversation; (2) a showing that the operator of the device was competent; (3) the establishing of the authenticity and correctness of the recordings; (4) a showing that changes, additions or deletions have not been made; (5) a showing of the manner of the preservation of the recording; and (6) identification of the speakers *(Steve M. Solomon, Jr., Inc. v Edgar,* 92 Ga App 207; 58 ALR2d 1024, 1029). For a magnetic tape to be used in evidence, proper safeguards must be shown to have been used so as to protect the recording against error or spoliation. The speakers, as recorded, should be properly identified and adequate safeguards must be shown to have been taken to insure authenticity *(Fikes v State,* 263 Ala 89; *State v Williams,* 49 Wn 2d 354; Commonwealth v Brinkley, 362 SW2d 494 [Ky]; United States v McKeever, 169 F Supp 426; see, also, Frank v Cossitt Cement Prods. 197 Misc 670). Nowhere in the minutes before this court is there any testimony as to the method in which a conversation was recorded, that the operator was competent, that no additions, changes or deletions were made, whether the recording contained the entire ,conversation, and how it was preserved against error or spoliation. Furthermore, with respect to the transcripts, no evidence was adduced that they were compared with the contents of the tapes and were "word for word" (see *People v Feld,* 305 NY 322, 331). In passing, it should be noted that both defendant Rao, Sr., and Mrs. Errico testified, in effect, that before conversing about the Vitale bail matter, they discussed old acquaintances; according to Mrs. Errico, it was for "quite a while". Yet the transcript of such conversation furnished this court by the Special Prosecutor's office is only one and a half pages long and contains no such preliminary conversation. In addition to the infirmities above set forth as to the tapes and transcripts in general, the tapes obtained from a wiretap placed in the law office of defendants Rao, Jr., and Nigrone, and upon which Rao's fourth count and Nigrone's sole count are based, suffer from another deficiency; namely, that such tapes were not admitted in accordance with the sealing provisions of CPL 700.50 (subd 2) and 700.65 (subd 3), which provide as follows: "**§ 700.50 Eavesdropping warrants; progress reports and notice.** * * * 2. Immediately upon the expiration of the period of an eavesdropping warrant, the recordings of communications made pursuant to subdivision three of section 700.35 must be made available to the issuing justice and sealed under his directions." "**§ 700.65 Eavesdropping warrants; disclosure and use of information; order of amendment** * * * 3. Any person who has received, by any means authorized by this article, any information concerning a communication, or evidence derived therefrom, intercepted in accordance with the provisions of this article, may disclose the contents of that communication or such derivative evidence while giving testimony under oath in any criminal proceeding in any court or in any grand jury proceeding; *provided, however, that the presence of the seal provided for by subdivision two of section 700.50, or a satisfactory explanation of the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any communication or evidence derived therefrom"* (emphasis supplied). "A person who has, pursuant to CPL provisions, obtained information concerning an intercepted communication 'or evidence derived therefrom' may not testify regarding this knowledge unless the seal is still present on the recordings or a satisfactory explanation for its absence is provided" *(People v Sher,* 38 NY2d 600, 603). "The sealing requirement is to be strictly construed * * * The purpose of the requirement is * * * to

prevent tampering, alterations or editing; to aid in establishing the chain of custody; and to protect the confidentiality of the tapes" *(People v Nicoletti,* 34 NY2d 249, 253). Nowhere in the minutes was any allusion made to any seal with respect to the wiretap tapes, or the reason for a seal not being present.

### INSTRUCTIONS TO THE GRAND JURY

In his charge to the Grand Jury, the prosecutor who conducted most of the proceedings prefaced his review of the evidence by stating that one or another of the undercover agents had so testified. In truth, however, it was the prosecutor himself who had so testified by the device of leading and suggestive questions. It is also noteworthy that the charge defined many pertinent legal terms, including that of legally sufficient evidence, but not the term "competent and admissible" evidence. Of course, he never ruled, as was his duty, upon the competence and admissibility of the evidence presented. He also incorrectly advised the grand jurors that "what's in the transcripts that controls" (see *People v Harding,* 44 AD2d 800, 801). The prosecutor told the Grand Jury that his charge was not intended to influence it in its decision. However, when a grand juror expressed misgivings as to what had occurred ("in this particular case there seems to be very little corruption. Lying, yes. But it was like a setup to see whether or not a man is going to tell the truth or not. And it's a very, very difficult thing, as far as I am concerned"), he properly reiterated that the Grand Jury's judgment controlled. However, the other prosecutor present, who had participated in the presentation of the evidence to a lesser degree, intervened and addressed the grand jurors to allay these misgivings, as follows: "Mr. North: * * * Entrapment is a defense which a defendant can raise at trial. Whether or not entrapment lies here or not is not the consideration for the jury per se. But you should consider it. The Grand Jury is a sounding board and a testing board of a case and of the community. *You are bound to follow the law, and you are bound to vote a bill in accordance with the law.* * * * But, on the other hand, as well, *you are bound and duty bound and legally bound to apply the law as it's charged to you"* (emphasis supplied). Such instruction is simply not the law. It was an attempt to control the Grand Jury's findings, and constituted a coercive and highly erroneous and prejudicial charge (see *People v Percy,* 45 AD2d 284, affd 38 NY2d 806; cf. *People v Ferrara,* 82 Misc 2d 270). CPL 190.60 specifically provides that a Grand Jury *may* indict a person for an offense as provided in CPL 190.65; the latter statute provides that a Grand Jury *may* indict a person for an offense, etc. Although it may be the duty or privilege of the prosecuting officer to be present before the Grand Jury, it is improper for him to participate in the deliberations of that body, make arguments, state facts which have no relevancy to the guilt or innocence of the person under inquiry, or in any way to *influence or direct the Grand Jury in its findings* (see 38 CJS, Grand Juries, § 40). The assistant prosecutor also erred in answering the query of one grand juror as to what the term "the hook" meant. The answer given was that while it could mean that there was a contact in the case or something else, "in your consideration of perjury, the question is, was the question asked. So I really don't think that the meaning of the term is necessarily important." This remark was totally incorrect. The meaning could well have been an important factor in ascertaining whether Nigrone lied when he denied having asked the question whether a hook was in. The context in which Nigrone was asked the question before the Grand Jury was relevant to whether there was a "fix" in the Vitale case. An examination of

the transcript of the alleged conversation between Nigrone and Rao, Jr., reveals that Nigrone constantly urged Rao, Jr., to withdraw as attorney for Vitale, and also return the fee of $6,000. At one time he told Rao, Jr., that greed had gotten the best of him. This being so, the grand jurors should have been advised that they must be satisfied from the evidence that Nigrone understood the situation under which he was allegedly asked the question, and that he intentionally answered falsely (see *People v Rinaldi,* 44 AD2d 745). Further, in his instructions, the prosecutor made the following highly prejudicial statement: "Let me just say, you asked some questions before as to other crimes that may or may not been *[sic]* involved. Let me indicate to you at this time that this case is not closed, *that you will be hearing other witnesses, other officials who may have been engaged in the fixing of this case"* (emphasis supplied). The clear inference from such statement is that some of the witnesses who had been heard, three of whom were the defendants, had been engaged in the fixing of the Vitale case. Moreover, with respect to two of the defendants, Rao, Sr., and Nigrone, it so happens that no evidence was adduced that either had been engaged in the fixing of the Vitale case.

MISCELLANEOUS

Evidence was also presented to the Grand Jury of recorded telephone conversations between the prosecutor who conducted most of the proceedings and defendant Rao, Jr. The tape of the first telephone conversation was placed in evidence after Special Investigator Clancy testified (pursuant to leading questions) that the voices on the tape were those of the prosecutor and Rao, Jr. With respect to the second telephone conversation between the prosecutor and Rao, Jr., Clancy testified (again pursuant to leading questions) that he *listened* to the tape of that conversation, and that Rao, Jr., had said that he had further recollections about conversations with Ross Di Lorenzo. *That tape was never placed in evidence.* Thus, the grand jurors were presented with a rather bizarre combination of the prosecutor being an unsworn witness to his own conversations, and Clancy testifying as to the contents of a tape of one of the prosecutor's conversations, in the latter's presence, without that tape ever being presented in evidence and played. With respect to the two-count indictment of defendant Rao, Sr., I am of the opinion that the assignments of perjury, or his allegedly false statements, do not, as a matter of law, under the facts presented herein, constitute the crimes of perjury. The record indicates that Mrs. Errico visited Rao, Sr., in his judicial chambers, ostensibly to seek his aid on behalf of Vitale and Vitale's parents so that the bail money of $10,000 would not be confiscated by a Criminal Term of the Supreme Court, Kings County. The second count of his indictment charges him with swearing falsely when he testified that he never told a certain individual (Mrs. Errico), how to handle "her" problem in affecting a Judge's action on a criminal case. In the first count he is charged with swearing falsely when he denied ever telling someone (again Mrs. Errico) that the way to handle the Vitale bail problem "was to get a lawyer who knew the judge". As will be noted from the following excerpt from the minutes, the questions which elicited the allegedly false testimony under the second count, *preceded,* by one or two questions, the question which elicited the allegedly false statement under the first count: "Q Did you ever advise her on how to handle *her* problems? A Absolutely not. I didn't even know what the problem was. I wasn't interested in it. Q Did you ever tell Mrs. Errico how to handle her problem in affecting a judge's actions on a criminal case? A Of course not. Q Did you ever tell her

that the way to handle this problem was to go to a lawyer that knew the judge? A Absolutely not. I didn't care one way or the other. I didn't even know what she did. I found out later, in fact, it wasn't she, that she was interested in this boy. When my son appeared before the Grand Jury and spoke to me, I found out all about it. Before that I didn't know a thing about it, other than the once" (emphasis supplied). Thus, the crux of the testimony just quoted is that Rao, Sr., denied ever advising Mrs. Errico that to solve *her* problem, she should seek a lawyer for Vitale who knew the Judge. A reading of the relevant portion of the transcript of the tape of Mrs. Errico's conversation with Rao, Sr., was that whatever suggestion he made about obtaining a lawyer who knew the judge was for the benefit of Vitale and his parents, and not for Mrs. Errico's benefit, as is demonstrated in the following colloquy taken from the transcript: "Judge Rao: Has he got a lawyer? Mrs. Errico: I think he has, I don't know what it's all about. The mother came to me crying. She was crying. I knew the woman for ten years. You know, I would have never come to you or ask you if I thought for one minute there was anything really wrong. And I know that there isn't. Judge Rao: What was he charged with? Mrs. Errico: Robbery. He was in with a couple of boys not knowing that this was going to happen, and he got himself mixed up in it too. Now, he had to put up a $10,000 cash bail and he's out on bail. They, the family, put up, they put it up. Now, *they* have hidden funds, *they* got funds. He's afraid that the judge is going to ask him where the $10,000 in cash come from. What *they* wanted was not to have the judge ask about the 10,000 in cash bail. *They're* afraid that *they* may, you know,—chieste Italian they have * * * in a Judge Rao: Who's the lawyer? Mrs. Errico: I don't know who the lawyer is. Judge Rao: Well, *they* should get a lawyer that knows the judge. Mrs. Errico: I don't know. See, they, ah—Judge Rao: *They* should have a lawyer that knows the judge" (emphasis supplied). The transcript continues for a short period thereafter. In the balance, Rao, Sr., advises Mrs. Errico to see his son, who had a law office across the street in the Woolworth Building, about the case. He also told her that he did not know a Judge "Pinkus" (phonetic), before whom Vitale was supposed to appear the next day, but that "they [evidently court personnel, etc.] would know my son's name or know me, anyway." A perjury conviction cannot be based on answers which are literally true, even in instances where false information may be conveyed by implication *(United States v Cook,* 489 F2d 286). A material variance between the assignment or averment of perjury and the proof is fatal (70 CJS, Perjury, § 8). Precise questioning is imperative as a predicate for the offense of perjury. So long as the witness speaks the literal truth, the burden is on the questioner to pin the witness down to the specified object of the questioner's inquiry *(Bronston v United States,* 409 US 352). The questioner has a duty to make the question and answer unambiguously specific if it is to support a charge of perjury *(United States v Esposito,* 358 F Supp 1032; cf. *People v Criscuoli,* 164 App Div 119). As will be gleaned from the above excerpt and synopsis, Rao, Sr., never gave Mrs. Errico any advice with respect to any problem she had, but instead responded to her inquiries as to what should be done either by, or on behalf of, Vitale's parents. In fact, Rao, Sr., seemingly indicated as much to the Grand Jury when he further testified: "I found out later, in fact, it wasn't she, that she was interested in this boy." I therefore believe that the two-count indictment against Rao, Sr., should be dismissed on the ground that the evidence adduced before the Grand Jury does not, as a matter of law, show that he testified falsely. I also wish to take note of the propensity of the Special Prosecutor's office to engage in what might be

classified as chronological inversion in the preparation and drafting of an indictment. For example, with respect to the seven-count indictment of Rao, Jr., the alleged false testimony constituting the basis for the second, third and fourth counts, are set forth on pages 84, 83 and 40 of the minutes, respectively. The testimony set forth on those pages reflects that Rao, Jr., testified before that body on April 17, 1974, when the allegedly false statements were made as set forth in counts two and three, and that the allegedly false statement with respect to count four was given on April 10, 1974. With respect to the fifth, sixth and seventh counts of Rao, Jr.'s, indictment, the same minutes reflect that the allegedly false statements are set forth therein on pages 35, 26 and 10, respectively, and were given on April 10, 1974. Why this procedure was employed, which makes it extremely difficult for the reader to match up the alleged false statements with the counts, is not ascertainable. Even more puzzling is the chronological inversion in each count of all of the indictments. Each count substantially reads that the Extraordinary Grand Jury had been conducting an investigation to determine whether such defendant had conspired to influence the proceedings in the Vitale case; and that as a result certain evidence had been presented to that body, such as, that the $10,000 cash bail for Vitale was the proceeds of the bogus robbery, that a representative of Vitale went to see Rao, Sr., about the bail problem, etc. After the recital of such evidence, and other evidence, being presented to the Grand Jury, each count then states that "accordingly, it became material and necessary to question the defendant about his knowledge", etc., "of the Vitale case", and that the defendant thereafter swore falsely. Those recitals clearly indicate that certain evidence was presented to the Grand Jury before any of the defendants testified. However, in truth and in fact, the Grand Jury minutes conclusively show that the defendants actually testified before any other evidence was placed before that body. Why such chronological falsity is present with respect to every count in each of the indictments is not apparent from the record. If the validity of these indictments were somehow sustained, the least that would have to be done would be that every count would have to be completely redrafted.

PROCEDURE

As mentioned at the outset, defendant Nigrone made an omnibus motion in which he included an application for inspection of the Grand Jury minutes. Such application was granted by Extraordinary Term on November 24, 1975. As I also indicated, Mr. Justice Murtagh's ruling to inspect, the subsequent examination, and the ensuing determination were all procedurally proper. Justice Murtagh's statement that "the Court on November 24, 1975 granted the defendant Nigrone's motion to inspect the Grand Jury minutes and proceeded to consider the *validity of the evidence before the Grand Jury*" (emphasis supplied), was in strict accordance with the following language contained in CPL 210.30 (subds 3, 4): "3. If the court determines that there is reasonable cause to believe that the grand jury evidence may not have been legally sufficient, it must grant the motion to inspect the grand jury minutes. *It must then proceed to examine the minutes and to determine the motion to dismiss the indictment.* 4. If the court determines that there is not reasonable cause to believe that the evidence before the grand jury may have been legally insufficient, it may in its discretion either (a) deny both the motion to inspect and the motion to dismiss, or (b) *grant the motion to inspect notwithstanding and proceed to examine the minutes and to determine the motion to dismiss*" (emphasis supplied). The better practice for Judges at nisi prius is to be most liberal in granting motions to

inspect Grand Jury minutes *"to the extent of examining them in camera for the purpose of determining their sufficiency"* (see *Matter of Miranda v Isseks,* 41 AD2d 176, 178–179; emphasis supplied). Extraordinary Term, having inspected the minutes, and having discovered that the indictment was not founded on legally sufficient and competent evidence, was statutorily empowered to dismiss the instrument (see CPL 190.65). Furthermore, such right is not only pursuant to statute, but is also by reason of "the inherent right and duty of the courts to protect the citizen in his constitutional prerogatives and to prevent oppression or persecution" *(People v Glen,* 173 NY 395, 400; see, also, *People v Raymo,* 32 Misc 2d 534; *People v Navarra,* 8 Misc 2d 497). If the deficiency was manifest upon the face of the minutes, no alleged deprivation of the right to answer the related dismissal motion could curtail the court's statutory and inherent power to dismiss. I fail to perceive what prejudice the People suffered in not interposing answering papers to Nigrone's applications to inspect the Grand Jury minutes and to dismiss the indictment. First of all, not having challenged the initial decision of the Extraordinary Term to read the minutes, and having delivered the minutes to the court for that purpose, the Special Prosecutor is not in a position now to complain because Extraordinary Term then proceeded to do what the statute mandates it to do, to wit, "examine the minutes and to determine the motion to dismiss [the indictment]". Secondly, contrary to the contention of the Special Prosecutor, there is no statutory provision or "fundamental rule of procedure" requiring the court, after reading Grand Jury minutes pursuant to a motion to inspect, to afford either side an opportunity to be heard before it renders its ultimate determination. Neither side, at that time, enjoys any procedural advantage, and whatever tactical or psychological advantage that may exist, inures to the prosecution, since it knows what is in the minutes while the defendant does not.[1] I also am of the opinion that once the court determines to dismiss an indictment upon personal inspection of the Grand Jury minutes, it may, *sua sponte,* dismiss other indictments arising out of the same proceeding, provided the infirmity found to exist extends to those other indictments as well. Just as in the case of codefendants charged under the same defective indictment, the dismissal as to one moving defendant would, in effect, extend to all, and there would be no need for formal motions by any of the codefendants (see *People v Eckford,* 7 Cow 535). Hence, the absence of any written motion to dismiss by the defendants Rao does not preclude dismissal of their indictments. Moreover, I do not agree with the majority that dismissal of the indictments, *inter alia,* in the interest (furtherance) of justice pursuant to CPL 210.40 was improper. The majority argues that the decision of Mr. Justice Murtagh demonstrates, "beyond peradventure, that these indictments were dismissed not 'in furtherance of justice' ", pursuant to CPL 210.40 (where the court may act, *inter alia,* on its own motion), but that they were dismissed either for an allegedly defective Grand Jury proceeding (CPL 210.35, subd 5); or for insufficiency of evidence (CPL 210.30). In the latter situations a motion to dismiss must be made in writing and upon written notice to the People. In my opinion, the majority places

---

1. Significantly, in his Practice Commentary to CPL 210.30 (McKinney's Cons Laws of NY, Book 11A, p 357) Richard Denzer states: "It may be noted that some judges, in granting the motion to inspect, have occasionally ordered the minutes given to the defendant and allowed adversarial argument on the sufficiency issue for purposes of determining the dismissal motion. No such authorization is provided in the CPL section."

much too narrow an interpretation on the scope of the decision under review. Concededly, one of the important factors upon which the decision was premised was the total lack of competent and admissible evidence presented to the Grand Jury. However, it is clear that the Extraordinary Term based its determination on other matters which it also deemed important. Specifically, Mr. Justice Murtagh made the damning observations that the evidence presented by the prosecutor was "in complete violation of the rules of evidence", and, that "there was not even *a pretense at compliance with the rules of evidence"* (emphasis supplied). Furthermore, in noting that one of the Assistant Special Prosecutors elicited answers from his witnesses pursuant to entirely leading questions, Mr. Justice Murtagh took pains to underscore the following quotation concerning leading questions from Betham (Rationale of Judicial Evidence [Browning's ed], vol VI, p 338): *"the examiner, while he pretends ignorance and is asking for information, is in reality giving instead of receiving it"* (emphasis supplied by Mr. Justice Murtagh). Thus, it is manifest that Mr. Justice Murtagh clearly intimated that the prosecutor who had conducted the questioning of the People's main witnesses was himself an unsworn witness. This court, on a number of occasions, has set aside convictions after trial in furtherance of justice where the prosecutor acted in such a manner, even in instances where no exception was taken to such conduct at the trial. Another reason for the Extraordinary Term's decision in the interest of justice was the fact that the two principal witnesses for the prosecution were asked to testify as to their opinions of the truth or falsity of statements made by the defendants. The majority, by its decision herein, is, in effect, holding that such basis does not lie under the term "interest of justice". Yet this court in the past has set aside at least one conviction, on the law and "in the interest of justice" because opinion testimony was erroneously allowed in evidence at the trial (see *People v Jaffee,* 42 AD2d 587). Thus, it is patent that Mr. Justice Murtagh based his determination not only on his finding of a mass of incompetent and inadmissible evidence in the minutes, but also on the questionable tactics and techniques used by the two assistant prosecutors who conducted the proceeding. That being so, it would have been a gross miscarriage of justice had he not quashed all of the indictments. Improper prosecutorial tactics in a given case can rise to such a level as to require a dismissal of the case (see *United States v Handler,* 383 F Supp 1267). The majority also states that, even assuming the dismissal of the indictments was premised upon the interest of justice, the court erred in not giving fair notice of its intentions to the parties and in not holding a hearing as to all pertinent considerations, citing *People v Clayton* (41 AD2d 204). However, a prerequisite to the holding of a hearing is the existence of facts in dispute which cannot be resolved upon documentary proof submitted to the court. In the instant case no claim was made by People, by brief or on oral argument, that Mr. Justice Murtagh based his decision on anything except what is contained in the Grand Jury minutes; or that there was anything else that he should have considered before arriving at his conclusion. It is axiomatic that a transcript of a record not challenged for accuracy imparts verity. In such event, it is completely superficial to order a hearing to find facts which the record already clearly and convincingly discloses (see *United States v Dorsch,* 156 F Supp 61, 63). As Mr. Justice Hopkins recognized in *People v Clayton (supra,* p 207), where the court, on its own motion, dismisses an indictment in the interest of justice, a hearing is not required, if, *inter alia,* facts essential to support the motion are either conceded by the People to be true or are *"conclusively substantiated by unquestionable documentary*

*proof"* (see CPL 210.45, subd 4, par [c]; emphasis supplied). Thus, since the facts are conclusively set forth in the Grand Jury minutes, it follows that Mr. Justice Murtagh had a statutory right to make a determination on his own motion as to the Raos, in the interest or furtherance of justice, without setting the matter down for a hearing (see *People v Wingard,* 33 NY2d 192). Furthermore, since the entire matter herein is before us on appeal, this court, under its constitutional powers (NY Const, art VI, § 4) has the authority to examine the record and make any determination that the trial court made or could have properly made in the first instance (see *Judson v Central Vermont R. R. Co.,* 158 NY 597). The majority also asserts that the Extraordinary Term erred in failing to honor a 30-day adjournment which it had granted the Special Prosecutor to submit an answer to Nigrone's motion, on consent of opposing counsel, and instead determined the motion to dismiss before the expiration of that period. There is nothing in the record on appeal to support such conclusion. While Mr. Justice Murtagh did admit, in his opinion, that he had previously acquiesced to a number of agreements by opposing counsel to adjourn the time for the People to interpose an answer to Nigrone's omnibus motion, there is nothing in the record on appeal to suggest that he consented to having the postponement continue past November 24, 1975, the date on which Nigrone's application to inspect the Grand Jury minutes was granted. If anything, the decision of Mr. Justice Murtagh on that date to inspect the minutes *in camera* was clear notice both to the People and to Nigrone that it intended to read the minutes to consider their efficacy; and, based on what it found, to render a determination as required by law. Since the minutes were delivered to Extraordinary Term by the Special Prosecutor's office, it stands to reason that it knew the reason for such acquisition. Furthermore, even if it is assumed that the opposing attorneys did, in fact, consent to a further adjournment, such agreement was not binding on the court. It should be borne in mind that Nigrone's omnibus motion had been before Extraordinary Term for six months before Mr. Justice Murtagh rendered his decision and, during all of that time, no answer had been forthcoming from the Special Prosecutor's office.

CONCLUSION

I cannot subscribe to the argument of the Special Prosecutor that the use of leading questions in the presentation of cases to Grand Juries has more than likely been the practice since the inception of the Grand Jury system. If a similar set of minutes should ever be presented to this court in the future by a prosecutor, I believe it would be our duty then, as I believe it is now, to set aside any accusatory instrument emanating from it. I have in the past read numerous sets of Grand Jury minutes, and have passed upon them. In my opinion, none of them ever contained even a miniscule fraction of the voluminous, patent, highly prejudicial and astounding errors which appear in this record. Today, the Grand Jury system is under attack from many sides and is threatened with either extinction or more rigid regulation. In many areas it is recognized not as an arm of the court on behalf of citizens, but rather as a tool or puppet of the prosecutor.[2] Presentments

---

2. "The past activities of the Justice Department and the possibility that such a pattern of abuse can occur in the future makes it imperative that the Federal grand jury system be overhauled so that similar outrages cannot be perpetuated" (Rep. Joshua Eilberg, Pennsylvania, NYLJ, June 29, 1976, p 1, col 1; see, also, Abuse of Power, a Staff Report of the Codes Committee of the New York State Assembly, May, 1976).

such as the one before us only strengthen such an attitude. I wholeheartedly endorse the proposition that the honest labors of a Grand Jury and a prosecutor, both of whose labors are within the prescription of a solemnly sworn duty, should not be lightly set aside (see *People v Carl J.,* 77 Misc 2d 538, 542). So, too, do I believe that those of us who have taken a solemn oath to interpret the law and administer justice in an honest and fair manner, should encourage and support those who are charged (as this Special Prosecutor is) with the awesome and often thankless responsibility of ridding corruption from our system of justice. However, the rule of law applies to all of us in our daily endeavors, whether we interpret laws and administer justice, prosecute the accused, drive a bus, or dig a ditch. No prosecutor has a right to make a shambles and mockery of a Grand Jury proceeding, and no court should ignore such a travesty when it comes to its attention. When viewed in aggregate, the cumulative mistakes herein, demonstrated by the eliciting of more than 61 pages of testimony from leading questions, together with the voluminous opinion testimony, augmented by a coercive and improper charge, plus the failure to properly authenticate the tapes and transcripts, and spiced with the sprinkling of false and prejudicial remarks by the Assistant Special Prosecutor throughout the proceeding, are so pervasive and enormous that quashing the indictment practically was mandated. This Grand Jury proceeding is so saturated with error that any indictment emanating therefrom should never again attain the status of a valid document.