### In re KAMMERLOHR.

(Supreme Court, Appellate Division, First Department. March 17, 1916.)

1. ATTORNEY AND CLIENT ☞53(2)—PROCEEDINGS FOR DISBARMENT—EVIDENCE.
    In proceedings for professional misconduct of an attorney, evidence *held* to sustain a charge that he converted to his own use a diamond ring intrusted to him.

    [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 75; Dec. Dig. ☞53(2).]

2. ATTORNEY AND CLIENT ⊂⇒53(2)—PROCEEDINGS FOR DISBARMENT—EVIDENCE.
   In proceedings for professional misconduct of an attorney, evidence *held* to sustain a charge that he passed and received money on his check on a bank in which he had no account.

   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 75; Dec. Dig. ⊂⇒53(2).]

3. ATTORNEY AND CLIENT ⊂⇒45—DISBARMENT—MISCONDUCT IN OTHER THAN PROFESSIONAL CAPACITY.
   Under Judiciary Law (Consol. Laws, c. 30) § 88, as amended by Laws 1913, c. 720, giving the Appellate Division of the Supreme Court authority to remove from office any attorney and counselor at law who is guilty of professional misconduct, crime, or misdemeanor, an attorney may be disbarred upon proof of a crime for which he has not been indicted, though it does not grow out of his professional relations with the client.

   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. § 63; Dec. Dig. ⊂⇒45.]

Proceeding against Joseph G. Kammerlohr, an attorney and counselor at law, upon charges of professional misconduct. Heard on application on the report of official referee. Respondent disbarred.

Argued before CLARKE, P. J., and SCOTT, DOWLING, SMITH, and PAGE, JJ.

Einar Chrystie, of New York City (Jerome H. Koehler, of New York City, of counsel), for petitioner.

Joseph G. Kammerlohr, of Brooklyn, pro se.

CLARKE, P. J. This is the usual proceeding instituted by the Association of the Bar of the City of New York to discipline an attorney. The respondent was admitted to the bar in April, 1904, and has ever since then practiced as an attorney and counselor at law. The petition sets forth two specific charges of misconduct. The official referee has reported that the first charge has not been sustained, but that the second has.

[1] As to the first charge, the petition alleges in substance that in May, 1914, the respondent converted to his own use a diamond ring received on memorandum from Charles Lang & Co., a firm of jewelers doing business in the city of New York. It appears that on May 8, 1914, the respondent went to the said firm's place of business and stated to Abraham L. Schongut, an employé, that he was about to go to Utica, N. Y., to see his brother-in-law, who was desirous of purchasing a diamond ring and had asked the respondent to bring him a few such rings from New York City for examination. Schongut had met the respondent some years before, and after consulting one of the members of the firm gave the respondent a diamond ring of the value of $325 upon his promise to return it on or before May 13, 1914, as evidenced by the following receipt:

"New York, 5/8/14.
"I have this day received from Chas. Lang & Co., 662–664 Sixth avenue, New York,
D. Sol agents No. 38057                                    Value, $325.
for the purpose of showing to a customer.
"I hereby agree to return the above articles to Chas. Lang & Co. on or before May 13, 1914.                      Joseph G. Kammerlohr,
                                        "1142 Dean St., Br'klyn, N. Y."

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The respondent admits the receipt of the ring and that he has neither returned nor paid for the same; his defense being that he lost the ring on the same day he received it. He testified that after leaving Chas. Lang & Co.'s place of business he went to Doyle's Billiard Academy, on Forty-Second street, near Sixth avenue, where he met and played a game of billiards with a stranger whom he had met there a number of times before. He did not know the stranger's name or business, but the latter had told the respondent that he lived at the Hotel Knickerbocker. Noticing that the stranger wore several diamond rings, the respondent says he showed him the ring which he had just received from Chas. Lang & Co. and asked his opinion of its value. The respondent then folded a copy of the receipt which he had received from Chas. Lang & Co., put it in the box with the ring, and put the box in his pocket. After playing billiards for about an hour, the respondent took a subway train for his home in Brooklyn. He testified that he first missed the ring as he was leaving the Flatbush Avenue subway station in Brooklyn, and immediately retraced his steps into the subway, but did not find it.

The petitioner has adduced no direct proof that the respondent did not lose the ring as testified, but contends that it has established such negative by indirect proof, and particularly by the testimony of the respondent himself on cross-examination. On the day following the alleged loss of the ring the respondent went to Utica, N. Y., where he remained for about 10 days. On May 15th he wrote Schongut from Utica:

"I presume you feel that I have decamped for parts unknown. I have been detained here by my father's illness, but am returning to-night, and will be in to see you Monday or Tuesday, which I trust will be satisfactory to you."

He did not call upon Schongut as promised, and on May 23d Charles Lang & Co. wrote the respondent as follows, addressing copies of the letter to his home in Brooklyn and to the hotel in Utica from which he had written Schongut:

"Please return at once the diamond ring you received from us on May 8."

On May 27, 1914, the respondent wrote Schongut from Baltimore, Md.:

"Your letter received here. Regret I was unable to get in to see you last week. I have to go to Washington and Richmond, but will be in New York Monday, when I will call without fail. I hope this is satisfactory."

Upon the respondent's failure to keep his appointment, Schongut made an effort to see him at his home in Brooklyn, but was told by his wife that he was still in Washington. Several days later Michael J. Sweeney, Chas. Lang & Co.'s attorney, also called at the respondent's Brooklyn address, but did not find him there.

Chas. Lang & Co. heard nothing further from the respondent until he appeared before the Association of the Bar of the City of New York to answer the charges preferred against him. It was then that the respondent for the first time claimed to have lost the ring. He admits that he made no mention of his alleged loss to his wife or to

his rei...tives in Utica. He neither advertised for the ring nor reported his loss to police headquarters. Though he admits having been in Doyle's Billiard Academy on several subsequent occasions, he did not report the loss to the proprietor, or inquire of the identity of the stranger to whom he had shown the ring. The respondent's only explanation of his unusual conduct is that he believed that, if the ring fell into honest hands, it would be returned either to himself or to Chas. Lang & Co., whose addresses appeared upon the receipt folded in the box containing the ring. Yet he made no inquiry of Lang & Co. as to whether the ring had been returned to them, and instead implied by his letters and silence that it was still in his possession.

We are unable to reconcile the conduct of the respondent, as thus shown by his own testimony and evidenced by his letters, with his claim that he lost the ring. It is incredible that under such circumstances the respondent would have made no effort to find the ring, other than retracing his steps to the subway, and made no mention of his loss until charged with its theft. In the absence of direct proof controverting the respondent's claim, it would be difficult to establish a more convincing case against the respondent. In our opinion the evidence clearly sustains the first charge against the respondent, and the report of the learned referee as to this charge should be reversed.

[2] The undisputed facts establish the second charge. On October 8, 1914, he called upon Henry D. King, an insurance broker in the city of New York, and applied for a policy of fire insurance upon his home in Brooklyn. King told the respondent that the premium on such policy would be $25, and the respondent waited for the policy to be made out. When ready for delivery, the respondent drew a check for $40 upon the Bedford Branch of the People's Trust Company of Brooklyn, and asked King, whom he had known for some time, to accept the check in payment of the premium and let him have the balance of $15 in cash. King consented to do so, and handed the policy to the respondent, with a receipt for $25 and $15 in cash. The respondent admits that he had not then, nor has he since, had any account in the People's Trust Company, upon which the check was drawn. He testified that he had been frequently urged to open an account with that bank and intended to do so, having $200 at the time with which to open the account. It appeared on his cross-examination, however, that the $200 which he claimed to have available for deposit was money which his father, who lived in Utica, owed to him. There is no evidence that the respondent made any effort to collect this sum from his father at the time, and while he has returned the policy to King he has never reimbursed him for the $15 which he received with the policy. Any semblance of good faith which the respondent might assert in view of these facts is dispelled by his having numbered the check 732, thus creating the impression that his account with the People's Trust Company was one of considerable standing in point of time.

[3] The only remaining question presented is as to the power of this court to discipline an attorney for the commission of acts constituting a crime not growing out of his professional relations with a

client, before trial and conviction for such crime. The respondent denies this power, relying upon the case of Rochester Bar Association v. Dorthy, 152 N. Y. 596, 46 N. E. 835, in which the court, referring to Ex parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 27 L. Ed. 552, said:

"The majority opinion distinctly recognized the rule that where an attorney commits an indictable offense in a transaction not involving his character as attorney, and does not admit the charge, the court will not strike his name from the roll until he has been regularly indicted and convicted."

But Mr. Justice Bradley, writing for the majority of the court in Ex parte Wall, supra, expressly states:

"That the rule is not an inflexible one," and that "cases may occur in which such a requirement would result in allowing persons to practice as attorneys who ought, on every ground of propriety and respect for the administration of the law, to be excluded from such practice."

We have no doubt that the broad power vested in this court by section 88 of the Judiciary Law, as amended by chapter 720 of the Laws of 1913:

"The Supreme Court shall have power and control over attorneys and counselors at law, and the Appellate Division of the Supreme Court in each department is authorized to censure, suspend from practice or remove from office any attorney and counselor at law admitted to practice as such who is guilty of professional misconduct, malpractice, fraud, deceit, crime or misdemeanor, or any conduct prejudicial to the administration of justice * * *"

—enacted since the decision in the Dorthy Case, authorizes us to take such action against the respondent as justice requires.

In the Matter of Stanton, 161 App. Div. 555, 146 N. Y. Supp. 890, the charge was that the respondent had committed perjury on the trial of an action wherein he was defendant. The official referee, without calling on the respondent to submit any testimony on his part, filed his report, in which he said:

"It is conceded, however, that the perjury, if any, was not committed in his character as attorney, but as defendant litigant in a civil action. * * * In my judgment the respondent should not be burdened with this imputation in advance of his trial for the crime of which he is accused. Let him be tried for that felony, and conviction would ipso jure operate his disbarment. * * *"

This court, in setting aside the report and sending it back for the taking of testimony, said:

"Under subdivision 2 of section 88 the disbarment of an attorney who has committed a crime would not be dependent upon his conviction for that offense as it is under subdivision 3, and when an attorney is charged with the commission of a crime it is the duty of the Appellate Division to investigate, and, if the charge is proved, disbar him. The fact that he has not been indicted or convicted is not a defense in proceedings of this character, as then, no matter what crime an attorney had committed, if he was not prosecuted criminally, he could still remain a member of the bar. This court has no control over criminal prosecutions, but it is charged with the duty of preventing criminals from continuing members of the bar. While this court, when an attorney has been indicted may suspend the proceedings until after

the trial on the indictment, yet when an attorney has not been indicted the fact that he could be if the charge is true is no reason why the court should not investigate the charge."

This rule has been adopted by this court, not for want of power, but to avoid a possible prejudice to the accused on his trial upon the indictment. The respondent has conclusively demonstrated his unfitness to remain a member of an honorable profession, and therefore is disbarred. Settle order on notice. All concur.