THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
NORMAN ARCHER, Appellant.

Second Department, June 18, 1979

**APPEARANCES OF COUNSEL**

*Irving Anolik* for appellant.

*John F. Keenan, Deputy Attorney-General (Mark M. Baker* of counsel), for respondent.

*Aaron Nussbaum* for Macon B. Allen Black Bar Association, *amicus curiae.*

## OPINION OF THE COURT

PER CURIAM.

■ Appellant, a former Assistant District Attorney in Queens County and head of the Indictment Bureau, stands convicted of bribe receiving and receiving a reward for official misconduct. The jury found, beyond a reasonable doubt, that he had agreed to accept, and did accept, a sum of money from another in exchange for using his official position to have a pending criminal action "dismissed" before the Grand Jury. The primary issue on appeal is whether appellant's prosecution should have been barred by reason of alleged prosecutorial misconduct. After an exhaustive pretrial evidentiary hearing, denominated an "investigative technique hearing", the court denied appellant's motion to dismiss the indictment. We hold that appellant's prosecution was proper and that the judgment of conviction should be affirmed.

Appellant claims that this State prosecution was barred by reason of double jeopardy. Appellant was previously convicted in Federal court of offenses based upon the same criminal acts or transactions; that conviction was reversed by the United States Court of Appeals for insufficient evidence to show use of interstate facilities. *(United States v Archer,* 486 F2d 670.) This claim was considered and rejected in a CPLR article 78 proceeding in the nature of prohibition *(Matter of Klein v Murtagh,* 44 AD2d 465, affd 34 NY2d 988 on the opn of Mr. Justice MUNDER at the Appellate Division). He presents nothing new to cast doubt upon the continuing validity of that determination. The issue of alleged prosecutorial misconduct was also previously raised. However, it was expressly left open in the prior proceeding (see concurring opn of Mr. Justice SHAPIRO, 44 AD2d 465, 473, *supra),* and is now properly before us on a full factual record.

The charges against appellant arose out of an investigation into corruption in the criminal justice system in New York City, conducted by the office of the United States Attorney for the Southern District of New York, at the behest of the Knapp Commission, which was established in 1970 by then

Mayor John Lindsay, and with the knowledge and approval of the New York City Police Commissioner. The key figure in this investigation was Detective Robert Leuci, a corrupt member of the former Special Investigations Unit, which was concerned, in part, with the enforcement of narcotics laws. Leuci would only co-operate with Federal authorities, who were also interested in the integrity of narcotics law enforcement, and hence was referred to the United States Attorney's office by the Knapp Commission. Through Leuci's subsequent undercover activities, the authorities became aware of one Nicholas Di Stefano, who allegedly acted as a broker in setting up various "fixes". When Di Stefano accidentally discovered Leuci's undercover capacity, he was "turned" by Federal authorities.

As respects this particular facet of the investigation, which was concerned with the alleged widespread fixing of cases in Queens County, Di Stefano ultimately, though reluctantly, agreed to introduce a Federal undercover agent to a named Queens County bail bondsman allegedly engaged in corrupt activities. A plan was devised by the authorities whereby the Federal agent, posing as one Salvatore Barone, would be arrested in a Queens diner for felonious possession of weapons, thus allowing him to pose as an accused felon. Use of an informant or a defendant in an actual pending criminal case, rather than an undercover agent, had earlier been considered but rejected due to the need to proceed upon the most credible and corroborated evidence possible. The arresting officer, Murano, was a New York City police officer "loaned" to the United States Attorney's office by the Police Commissioner. On the appointed day, Barone and Murano literally acted out the entire scenario inside the diner and, after the arrest, the matter was processed in the usual manner. Barone was taken to a local precinct, a felony complaint was drafted and Murano signed an arrest affidavit detailing the basis for the charge of unauthorized possession of loaded weapons. The reason for having acted out the crime and arrest in the diner was to have the complaint and related sworn statements reflect Murano's actual observations and actions. For his part, Barone related a cover story as to his identity, address, employment and immigration status, which was buttressed by false documents. Barone was subsequently arraigned and admitted to bail, which was posted by another Federal agent posing as his father. After three adjournments, a preliminary

hearing was waived and the case was forwarded for presentation to the Grand Jury. None of the police officers (except for Murano), prosecutors or Judges involved in these matters was informed of the underlying charade. The omission was purposeful since both Leuci and Di Stefano had alleged that cases had been fixed in the office of the Queens District Attorney and Di Stefano had maintained that a case could be fixed at any stage, thus opening the possibility that an effort might be made to do it through a Judge. The authorities did, however, inform Judge FULD, then Chief Judge of the Court of Appeals, of the planned scenario although he was not asked to approve it and, therefore, did not give his opinion on it.

Thereafter, Barone was introduced by Di Stefano to Archer's codefendant, Wasserberger, a Manhattan bail bondsman. Wasserberger was approached when it was discovered that the Queens bail bondsman upon whom Di Stefano had originally focused was not then in New York State. The latter was a relative of Wasserberger. Wasserberger, in turn, introduced Barone to codefendant Klein, an attorney practicing criminal law in Queens County. Klein and Barone discussed the pending criminal case and, when Barone rejected Klein's suggestion that he plead guilty to a misdemeanor and stated that it would be worthwhile to him not to have to go to court, Klein indicated that the Grand Jury would have to be convinced that no crime had occurred. The latter stated that this would cost $10,000 to $15,000 in cash, and that he would get back to Barone later on what could be done, it being necessary that he see a man in Queens first. After leaving Klein's office, Barone and Wasserberger had a discussion, during which the latter indicated that the critical person would be the District Attorney who presented the case to the Grand Jury.

The next time Barone met with Klein, Klein stated that he had contacted the Assistant District Attorney in charge of the Grand Jury in Queens County, who could take care of Barone's problem; that this assistant would personally present the evidence to the Grand Jury; and that Barone would have to testify since the arresting officer could not be fixed, having already committed himself in the felony complaint to having seen one of the guns sticking out of Barone's belt. Klein then instructed Barone as to exactly what to say when he appeared before the Grand Jury, which story depicted Barone as an employee of a Las Vegas hotel who traveled to other cities to collect money from gamblers and carried a gun, for which he

was licensed in Nevada, to safeguard such moneys. (He explained that he possessed the second gun since he was temporarily carrying it for a friend to whom he was to return it the next day.) The game plan of the Federal authorities had not contemplated that Barone would have to appear before a Grand Jury and testify under oath. However, having committed himself to the Police Commissioner and his own superiors to follow through on the allegations wherever they led and feeling an obligation to the public to determine whether Klein's statements about appellant (the Assistant District Attorney in charge of the Queens Grand Jury) were true, the United States Attorney personally approved Barone's appearance before the Grand Jury. Barone was instructed, nevertheless, not to mechanically record or transmit the proceedings before the Grand Jury, and to limit his testimony solely to the story concocted by Klein. Barone testified as instructed and Murano testified in accordance with the felony complaint and arrest affidavit. Appellant, who indeed presented the case to the Grand Jury, indicated to the jurors that Barone's Nevada gun permit had been verified and also suggested that the arrest and seizure of the guns had been unlawful. The Grand Jury voted no true bill. Sometime thereafter, searches of appellant's home and Klein's safe deposit box unearthed marked money which had been given by Barone to Klein.

In overturning appellant's prior Federal conviction for violation of section 1952 of title 18 of the United States Code, the so-called Travel Act, for insufficient proof of the use or agreement to use interstate or foreign facilities in carrying out the above-mentioned corrupt activities, the Second Circuit declined to decide or pronounce dicta on the issues of prosecutorial misconduct and possible abuse of Federal power raised by appellant. However, it nevertheless "ventilated" its views on the subject, severely criticizing what it saw as "an arrogant disregard for the sanctity of the state judicial and police processes" displayed by the government agents, and finding the pattern of deception perhaps "less serious than some forms of governmental participation in crime that can be hypothesized [but] more offensive than the common cases where government agents induce the sale of narcotics in order to make drug arrests" (United States v Archer, 486 F2d 670, 677). Despite the fact that the court had "expressly left 'resolution of this difficult question for another day,'" the government petitioned for a rehearing and explored, for the

first time, the factual background of its investigation. *(United States v Archer, supra,* p 683.) As a result, the Second Circuit muted its criticism, noting that the fact that the Knapp Commission sought the assistance of the Department of Justice, that the New York City Police Commissioner indorsed a Federal investigation of the Queens County prosecutor's office, and that the United States Attorney disclosed the plan to a member of the State judiciary with administrative responsibility over the State court system, including Queens County, "lessens the offensiveness to the State of the conduct here at issue" (486 F2d 670, 683, n 1, *supra).* The record presently before us is far more complete on this issue, the factual background of this investigation having been thoroughly elicited upon the pretrial "investigative technique hearing". Based upon such record, we hold that the conduct of the law enforcement agents in this case does not offend due process and that appellant's prosecution was, therefore, proper.

The United States Supreme Court has thus far declined to bar a prosecution arising out of police misconduct unless the defense of entrapment has also been made out, although it has not ruled out such action in the future under sufficiently compelling circumstances (see *United States v Russell,* 411 US 423; *Hampton v United States,* 425 US 484). Nevertheless, our own Court of Appeals has recently imposed higher standards on police conduct under our State Constitution and has articulated some of the more telling facts in a State due process analysis of permissible police conduct. Thus, in *People v Isaacson* (44 NY2d 511, 521-522), the court held: "Illustrative of factors to be considered are: (1) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity (compare *Greene v United States,* 454 F2d 783, with *United States v Russell,* 411 US 423, *supra);* (2) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice (see *United States v Archer,* 486 F2d 670, *supra; cf. Rochin v California,* 342 US 165, *supra);* (3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness (see Schecter, Police Procedure and the Accusatorial Principle, 3 Crim L Bull 521, 527); and (4) whether the record reveals simply a desire to obtain a conviction with no reading that the police

motive is to prevent further crime or protect the populace. No one of these submitted factors is in itself determinative but each should be viewed in combination with all pertinent aspects and in the context of proper law enforcement objectives—the prevention of crime and the apprehension of violators, rather than the encouragement of and participation in sheer lawlessness. As a bare minimum, there should be a purposeful eschewal of illegality or egregious foul play. A prosecution conceived in or nurtured by such conduct, as exemplified in these guidelines, so as to cast aside and mock 'that fundamental fairness essential to the very concept of justice' should be forbidden under traditional due process principles."

Applying these factors to the case at bar, we find that while the government created the predicate for appellant's crime by contriving a criminal case which could then be "fixed", it did not manufacture a crime which otherwise would not likely have occurred. At the time contact was made with Wasserberger, the government did not know of Klein and appellant. There never was any contact between appellant and Barone, the government agent, until all the details had been worked out by Klein and, pursuant to that plan, Barone appeared before the Grand Jury and testified to their concocted story, as instructed. Thus, appellant's participation in this corrupt scheme was not the product of active encouragement or instigation by the government. Rather, it was Klein who brought appellant into the scheme after Barone suggested that it was worth it to him were the case not to proceed; and it was these conspirators who readily seized upon the opportunity presented and determined just how dismissal was to be accomplished. Appellant has never claimed entrapment or lack of predisposition and there is no evidence whatsoever that his participation in this scheme was the least bit reluctant. On the contrary, the evidence strongly suggests that appellant and Klein were engaged in ongoing criminal activity long prior to the appearance on the scene of the government agent. Furthermore, the record conclusively establishes that the government's motivation in this affair was to weed out existing corruption and restore the integrity of the criminal justice system in Queens county.

The last factor remaining for consideration under the *Isaacson* analysis is whether the government itself engaged in criminal or improper conduct repugnant to a sense of justice.

We hold that it did not. It is appellant's contention that both Federal and State law enforcement officers committed perjury before a State Grand Jury and in affidavits filed in courts of record, suborned the commission of such perjury, committed the crime of offering false instruments for filing with a State public official, falsifying Federal immigration records, and conspired to commit the foregoing offenses. Taken literally, it would appear that the conduct of law enforcement officials in this case could well fall, prima facie, within the prohibitions of our Penal Law. On the other hand, a defense of justification in that these "offenses" were "performed by a public servant in the reasonable exercise of his official powers, duties or functions" (see Penal Law, § 35.05, subd 1) would also appear to be available. Thus, whether the subject conduct constituted a crime is not the limit of our inquiry. The real question is whether such conduct was consistent with a sense of justice and respect for appellant's fundamental rights.

It should be noted that before the government sanctioned a plan of action which would involve deception of various officials in the criminal justice system, it first carefully considered other less offensive alternatives and, after discarding them, at least tried to limit the deception to the minimum extent necessary. Furthermore, prior knowledge of the plan was given to then Chief Judge of the New York State Court of Appeals, who had administrative responsibility for the criminal justice system in Queens County. The government's original scenario did not include or foresee the deception of a regular Grand Jury, unlike the situation in *Matter of Nigrone v Murtagh* (46 AD2d 343, affd in part and app dsmd in part on other grounds 36 NY2d 421). There, the prosecution set up a simulated robbery arrest, processed the matter through the lower court and secured an indictment for robbery from a regular Grand Jury, without ever informing the grand jurors or the Assistant District Attorney who presented the case that the entire matter was a hoax. Thereafter, the prosecutor set up a situation whereby the ostensible defendant, really an undercover police officer, appearing with his retained counsel, a target of the investigation, deceived the court with respect to a bail forfeiture. Counsel later withdrew from the case on the stated ground that his client was insisting he "fix" the case, after which counsel, and two others, were called to testify before a special Grand Jury and were eventually indicted for perjury. Although this court employed some broad

language in condemning the conduct of the prosecutor in *Nigrone* (the perjury indictment was, however, upheld), our primary concern was clearly with his intolerable misuse of the regular Grand Jury. That deception of the Grand Jury, which occurred long after the investigation scrutinized at bar, constituted a mere predicate step in the prosecution's scenario and was an integral part of the investigative technique employed. At bar, by way of contrast, the Grand Jury deception was planned and engineered by the criminal conspirators, not the government, and constituted the very means by which the conspirators chose to carry out their crime. Indeed, it was the same activity for which appellant was prosecuted. Under these circumstances, too, disclosure of the contrived character of the Barone criminal case to either the grand jurors or the prosecutor was impossible, as a practical matter.

We would again caution law enforcement officials, when dealing with corruption within the criminal justice system, that they may no more engage in flagrant misuse of such system than the individuals they seek to prosecute. However, we are persuaded that the conduct of law enforcement officials in this case was not improper. Although for the future such deception might more wisely be circumscribed by the development of judicial guidelines, we hold, to use the words of the Extraordinary Special and Trial Term, that "the carefully selected use of the contrived crime under appropriately compelling circumstances", which is this case, is not repugnant to a sense of justice. We also hold that viewing all of the factors pertinent to a proper due process analysis of police conduct in combination, due process does not mandate dismissal of appellant's indictment.

We have examined appellant's remaining claims for reversal of his conviction and find them to be without merit. We would add that it is improper for the *amicus curiae* herein to raise issues and cite alleged errors which were never raised or cited by appellant either in the trial court or on appeal.

DAMIANI, J. P., SUOZZI, LAZER and RABIN, JJ., concur.

Judgment of the Supreme Court, Queens County, rendered August 5, 1977, affirmed, and case remitted to the Supreme Court, Queens County, for further proceedings pursuant to CPL 460.50 (subd 5).