THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PAUL P. RAO, JR., Appellant.

Second Department, February 25, 1980

### APPEARANCES OF COUNSEL

*Saxe, Bacon & Bolan, P. C. (Roy Cohen, Thomas A. Bolan, John F. Lang, Roy R. Kulcsar* and *Louis Biancone* of counsel), for appellant.

*Roderick C. Lankler, Deputy Attorney-General (Thomas A. Duffy, Jr.,* and *Vincent Torna* of counsel), for respondent.

### OPINION OF THE COURT

TITONE, J.

Defendant-appellant appeals from a judgment of conviction, after a jury trial, of the crime of perjury in the third degree (one count). However, on appeal, the conduct of the trial and the ensuing conviction are overshadowed by the highly questionable tactics employed by the then Special Prosecutor* to obtain a seven-count indictment charging appellant, an attorney, with the crime of perjury in the first degree, and similar

---

* All references hereafter to the Special Prosecutor shall mean the prosecutor in office at the time the acts in question occurred.

indictments against two other defendants. The indictments of the other defendants have previously been dismissed.

This case has a long, involved and checkered history. In the latter part of 1974, the three defendants moved in this court to have the charges dismissed upon the grounds of prosecutorial misconduct. While all three accusatory instruments were sustained by a 3 to 2 vote, both the majority and the dissenters strongly condemned the tactics employed by the Special Prosecutor to obtain them (see *Matter of Nigrone v Murtagh*, 46 AD2d 343, affd 36 NY2d 421). In the summer of 1976, this court by a 4 to 1 vote, reversed an order of the Extraordinary Special and Trial Term dismissing the indictments and reinstated them solely on the ground that the Special Prosecutor had not been given an opportunity to be heard on the issues considered by that court in arriving at its decision *(People v Rao,* 53 AD2d 904).

However, developments in the law which have evolved over the past few years, and additional information imparted to this court relating to this case, not only justify, but mandate, that we review the case from its inception and re-evaluate the validity of appellant's indictment. Amongst the pertinent developments in the law are the following statements contained in two decisions of the Court of Appeals, to wit: (a) the dismissal of defendant's appeal from this court's earlier determination sustaining the validity of his indictment *(People v Rao* [decided with *Matter of Nigrone v Murtagh, supra],* 36 NY2d 421, 426, *supra,* opn per BREITEL, Ch. J.); and (b) the affirmance of this court's determination reversing the conviction and dismissing the indictment of the defendant in *People v Tyler* (46 NY2d 251, 258-259).

(a) *Matter of Nigrone (People v Rao, supra,* p 426): "Finally, no view is expressed on the issue raised by petitioner and relied upon in part by the dissenters at the Appellate Division that a perjury prosecution may not lie validly if the proceeding in which the perjury occurred was designed solely, and for no other valid purpose than, to produce the perjury. Such an issue, apart from anything else, would of necessity involve a question of fact not disposable on papers submitted on motion. *In any event, the issue must be raised by defense in the criminal action and presumably would test the issue whether an oath was ever validly administered to petitioner in the proceeding in which he allegedly perjured himself."* (Emphasis supplied.)

(b) *People v Tyler (supra,* pp 258-259): "The primary function of the Grand Jury is to uncover crimes and misconduct in public office for the purpose of prosecution (see NY Const, art I, § 6; CPL 190.65, 190.55). False testimony before the Grand Jury, then, especially by the holder of public office, is a grave matter affecting the public interest and the administration of justice. *It is not properly a principal aim of the Grand Jury, however, to 'create' new crimes in the course of its proceedings. Thus, where a prosecutor exhibits no palpable interest in eliciting facts material to a substantive investigation of crime or official misconduct and substantially tailors his questioning to extract a false answer, a valid perjury prosecution should not lie (see Brown v United States, 245 F2d 549, 554). Since no legitimate investigatory function is discernible in questioning designed primarily or solely to support a perjury prosecution against the witness, it cannot be said that the responsive testimony, albeit false, frustrates any authorized purpose of the Grand Jury.*" (Emphasis supplied.)

## A. FACTS

In the spring of 1973, the Special Prosecutor concocted a simulated robbery for the ostensible purpose of infiltrating the criminal justice system in Kings County. The scenario called for an undercover officer, one Stephen Wilkowski, who assumed the name of Stephen Vitale, to be arrested for the armed robbery of a businessman of approximately $8,200. A false felony complaint was lodged against Vitale. He was fingerprinted, arraigned, and bail was set at $10,000 by a Judge in Supreme Court, Criminal Term. The latter was unaware that the "crime" and ensuing proceedings were all a ruse. The Special Prosecutor's office also fabricated a false criminal record for Vitale which indicated that he had two prior arrests.

Thereafter, the Special Prosecutor directed Loretta Errico to contact appellant's father, Judge PAUL P. RAO of the United States Customs Court. Mrs. Errico, who had been arrested for bribery, and who thereafter agreed to co-operate with the Special Prosecutor, was an old acquaintance of Judge RAO, but had not seen him in 40 years. She visited Judge RAO in his chambers on November 12, 1973. She urgently requested Judge RAO to help Vitale with respect to his trouble with the law. At the suggestion of the Special Prosecutor, she falsely told Judge RAO that Vitale was a son of two friends of hers. Although apparently unaware of the "Vitale" hoax, she was

equipped with a concealed tape recorder by the Special Prosecutor's office for her visit to Judge RAO's office. (She was likewise so equipped on later occasions when she visited appellant at his law office.) Judge RAO referred her to his son, appellant Paul P. Rao, Jr., a practising attorney.

The scenario then changed and the Special Prosecutor's efforts focused on appellant. Upon leaving Judge RAO's chambers, Mrs. Errico proceeded to appellant's law office and arranged to have Vitale meet him later that day. At the ensuing meeting appellant agreed to represent Vitale in the pending "robbery" case. Vitale was wired with a recorder both on that occasion and at subsequent meetings he had with appellant in connection with the matter.

On November 23, 1973 Vitale was indicted for robbery (two counts) and grand larceny (two counts) by a Kings County Grand Jury. The Grand Jury members and the Assistant District Attorney who presented the case were unaware of the contrived nature of the events unveiled at the proceeding. When Vitale failed to appear for arraignment on the indictment the cash bail posted by him was declared forfeit. Through appellant's efforts the forfeiture was revoked, the bail money was returned, new bail was fixed at a lesser amount than originally set and meaningful inquiry into whether the bail money was the proceeds of the manufactured robbery was avoided. The Supreme Court Justices before whom the bail issue was presented likewise did not know that the "Vitale" robbery case was a charade. Appellant withdrew from the case as Vitale's attorney in March, 1974. In doing so he at that time advised both the District Attorney's office and a Supreme Court Justice that Vitale was seeking to have the case "fixed".

In April, 1974 Judge RAO, appellant, and the latter's law partner or associate, Salvatore Nigrone, appeared before the Extraordinary Special Grand Jury, at the Special Prosecutor's request. At the time that body was purportedly investigating whether they had conspired with a Judge of the New York City Civil Court and others to bribe a Kings County Supreme Court Justice to influence the outcome of the Vitale case. Unlike the situation in the Kings County Grand Jury where that body was unaware of the bogus nature of the Vitale case, the Special Grand Jury was made aware it was a sham.

Each of the three defendants testified before the Special Grand Jury under the waiver of immunity. The undercover

agent, Wilkowski (Vitale), and Mrs. Errico also testified. In addition, surreptitiously made tape recordings of conversations engaged in by all three defendants were placed in evidence.

In May, 1974, Judge RAO was indicted and charged with two counts of perjury, appellant was charged with seven counts of perjury, and Nigrone, with one count of perjury. In 1977 the indictments against Judge RAO and Nigrone were dismissed. No appeal was taken by the Special Prosecutor's office from either order of dismissal.

On August 12, 1977 the trial court (POLSKY, J.), dismissed the fourth count against appellant on the ground that the information giving rise to the alleged perjury was derived from the unlawful use of information obtained from an unsealed tape which had previously been suppressed. As a result counts five, six and seven were renumbered four, five and six, respectively. In addition, recital of facts in each of the remaining six counts pertaining to the "hook" conversation was deleted. Appellant was found guilty, after a jury trial, of perjury in the first degree under count four of the indictment. In that count appellant was charged with testifying falsely before the Extraordinary Grand Jury that he did not help Vitale in creating a "phony" story or defense in connection with the bogus robbery case. On March 22, 1978, the trial court reduced the verdict to perjury in the third degree (a class A misdemeanor) and sentenced appellant to an unconditional discharge.

### B. PRESENTATION TO EXTRAORDINARY GRAND JURY

On the second occasion this case was before this court on appeal, it was demonstrated via the dissenting opinion that the integrity of the Extraordinary Grand Jury proceeding was seriously compromised and perhaps totally subverted by the untoward tactics and techniques employed by the two assistant prosecutors who presented the case against appellant and the other defendants to that body. Specifically, the dissenter pointed out, *inter alia,* that (1) more than 61 pages of testimony was adduced by the prosecutor's representatives from leading questions addressed mostly to the People's two principal witnesses Errico and Wilkowski (Vitale); (2) a voluminous amount of opinion testimony was extracted from the same two witnesses; (3) coercive and highly erroneous and prejudicial instructions were given; and (4) tapes and transcripts were not properly authenticated before being presented to that body *(People v Rao,* 53 AD2d 904, 908-914, *supra).*

Furthermore, as a result of a reading of the Grand Jury minutes in connection with this appeal it must also be noted, as revealed in the following colloquy, that one of the assistant prosecutors who conducted the proceeding wrongfully induced and directed appellant to violate the confidential attorney-client relationship appellant had with his supposed client, Vitale:

"Q. You indicated that during the course of some of your meetings with Vitale you planned a defense to his case.

"A. Yes.

"Q. And did you discuss the facts of his case with him?

"A. Yes, I did.

"Q. Would you please tell us what those facts were, as he told you?

"A. Really, I don't know, I think I would be jeopardizing Mr. Vitale when he goes to trial * * *

"Q. These proceedings are secret, and we are not an adjunct of the D.A.'s office, and they certainly won't be used against Mr. Vitale.

"A. Are you relieving me of the responsibility of client-attorney privilege, so I don't get in any trouble with the Bar Association?

"A. *Yes, we are.*

"A. Are you directing me to answer?

"Q. *Yes, we are.*" (Emphasis supplied.)

C. FACTS NOT PREVIOUSLY DIVULGED EITHER TO THIS COURT OR THE EXTRAORDINARY GRAND JURY

The issue to which the prosecutors directed most of their attention and efforts before the Extraordinary Grand Jury was whether appellant had assisted Vitale in preparing a perjurious defense to which the latter would testify at the trial of the bogus indictment. When questioned on this issue before that body, appellant stated several times that he had told Vitale that he was not going to take the stand. Thereafter, Vitale (Wilkowski) testified before the same body that appellant had told him he should testify to a false story, to wit, that at the time and location of the staged robbery he (Vitale) had been looking for a job in nearby factories and had become the object of homosexual advances by the (bogus) complainant. However, at appellant's trial, Vitale admitted that appellant had told him he would not take the stand at

the trial and that he "might have [made] a mistake" in his Grand Jury testimony.

Moreover, revealed for the first time at appellant's trial was the fact that the Special Prosecutor had been in possession of tapes for some time which both corroborated appellant's Grand Jury testimony that he told Vitale he would not testify at the trial and also contradicted Vitale's Grand Jury testimony on that very same issue. Nevertheless, the then Special Prosecutor, demonstrating a shocking disregard for the concept of due process and simple fairness, withheld these crucial tapes from the Extraordinary Grand Jury. Specifically, a portion of a tape not played before the Grand Jury contains the following colloquy between appellant and Vitale:

"Rao, Jr.: You're not gonna take the stand. You can't testify to it.

"Vitale: I'm not gonna take the stand.

"Rao, Jr.: No, you're not taking the stand. And then, if you should take the stand I'll bring out you're prior record * * * It won't make us look good, right? * * * and I think it [the trial] will be over within a day. But, with your record, you cannot take the stand."

Finally, although not raised on appeal by appellant, it should also be mentioned that the Special Prosecutor's office practised a gross and unfair deception upon the Extraordinary Grand Jury with respect to the testimony of Mrs. Errico. As revealed at trial, prior to becoming an undercover agent for the Special Prosecutor, Mrs. Errico had been apprehended for bribery. She agreed to "co-operate" with the Special Prosecutor only after she had been promised favorable consideration in her pending bribery case. Not only did the Special Prosecutor fail to reveal this arrangement to the Extraordinary Grand Jury as a matter reflecting on Mrs. Errico's credibility, *but the prosecutors also compounded the deception by actually playing out a charade and having Mrs. Errico execute a waiver of immunity prior to her testifying before that Grand Jury.*

### DETERMINATION ON APPEAL

■ By law a prosecutor has the power, and indeed the obligation, to submit evidence to a Grand Jury concerning misconduct, nonfeasance or neglect in public office by a public servant, whether criminal or otherwise (CPL 190.55). Implicit

in such statutory power is the prosecutor's concomitant authority to aid and advise a Grand Jury in any investigation it conducts of corruption involving a public servant in the carrying out of his or her official duties. Thus I have no quarrel with the fact that the then Special Prosecutor decided that the Extraordinary Grand Jury should conduct an investigation into whether appellant, as a practising attorney, was engaged in activities relating to the Kings County criminal justice system, designed to corrupt and compromise judicial and court personnel in legal matters brought to their attention in the course of judicial business. Indeed the then Special Prosecutor, under Executive Order No. 58 (9 NYCRR 1.58), promulgated by Governor Rockefeller on September 19, 1972, and pursuant to assignment by Attorney-General Lefkowitz, had a sworn duty to aid the Extraordinary Grand Jury in any such investigation as to possible unlawful activity in the criminal justice system. However, in this matter what is palpably evident from the record is that the duties delegated to the Special Prosecutor's office were carried out by its representatives outrageously and with an undisguised contempt for the rule of law. The prosecutors concocted fictitious crimes, falsified records, duped Supreme Court Justices properly engaged in their judicial duties and orchestrated the introduction before a Grand Jury of perjurious testimony of criminal activity which never occurred. None of these monstrous and patently illegal actions are or should be tolerated in a free society, particularly when practiced by those sworn to enforce the law and ferret out crime. Yet, the representatives of the Special Prosecutor's office knowingly engaged in all such acts and more in obtaining the "Vitale" indictment. In similar vein, one might well be accused of belaboring the obvious or engaging in unnecessary rhetoric for stating that our criminal justice system is befouled and besmirched whenever law enforcement officers conduct a Grand Jury proceeding in which (a) the confidential attorney-client relationship is denigrated and trampled upon by a person who is himself a lawyer, (b) the criminal background of a principal witness for the People is deliberately concealed by the use of deceptive acts, (c) the introduction of competent and admissible evidence as mandated by CPL 190.65 (subd 1) is the exception rather than the rule, (d) exculpatory evidence directly bearing on an issue placed before the Grand Jury is consciously withheld from that Grand Jury and (e) erroneous, coercive and misleading instructions are given so as to control the Grand Jury's

findings. Yet all these and other transgressions were committed by the representatives of the then Special Prosecutor in order to satiate his appetite for indictments against appellant and the two other defendants.

■ Simply stated, what is evident in this case is misconduct of law enforcement agents so calculated, insidious and pervasive as to require as a matter of due process the vacating of the conviction and dismissal of the indictment (cf. *United States v Russell,* 411 US 423, 431-432). When we compare the actions of the law enforcement officials herein with matters where suppression of evidence was granted and indictments dismissed because a police officer erroneously but in good faith and on the spur of the moment, conducted a search without obtaining a search warrant, or perhaps because of inexperience, gave inadequate *Miranda* warnings, the latter situations are paled by the comparison. What we have in this instance is a pattern of prosecutorial misconduct, commencing in the spring of 1973 when the "Vitale" scenario was created, continuing and escalating for almost a year, and finally culminating in the indictments of appellant and the other defendants in May, 1974.

At oral argument before this court, respondent argued that even though the actions taken by the representatives of the then Special Prosecutor prior to the trial of appellant may have been highly irregular and deserving of condemnation, nevertheless, the conviction should be affirmed since it was based on legally sufficient evidence adduced at the trial. In particular, respondent points out that the exculpatory conversation between appellant and Vitale, withheld from the Extraordinary Grand Jury, was presented to the petit jury which nonetheless found appellant guilty of the count charging him with helping Vitale create a phony defense. What the respondent was alluding to is the following language contained in CPL 210.30 (subd 6):

"210.30 Motion to dismiss indictment on ground of insufficiency of grand jury evidence; motion to inspect grand jury minutes * * *

"6. The validity of an order denying any motion made pursuant to this section is not reviewable upon an appeal from an ensuing judgment of conviction based upon legally sufficient trial evidence."

■ ■ In my opinion the above-quoted statutory language has no bearing whatever on what transpired prior to the trial and conviction of appellant. Implicit under subdivision 6 is the

premise that a conviction after trial upon legally sufficient evidence will not be set aside where, prior thereto, a prosecutor, although acting in good faith, inadvertently failed to make out a prima facie case before the Grand Jury based primarily on competent and admissible evidence. That provision, however, does not constitute a license for a prosecutor to inundate a Grand Jury with a massive wave of incompetent and inadmissible evidence, and knowingly withhold exculpatory evidence, as was done in this instance. Moreover, what is involved here is not merely a Grand Jury presentation, or a trial and conviction each set in isolation, but rather a continuing pattern of prosecutorial misconduct over a lengthy time span so egregious that appellant should never have been brought to trial. It is clear that the requirements of due process in a given case may extend to pretrial conduct of law enforcement authorities, and may also be invoked to bar prosecution altogether where it resulted form illegal law enforcement practices (see *United States v Toscanino,* 500 F2d 267, 273). Due process is now viewed as requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as a result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights *(United States v Toscanino, supra,* p 275).

█ Finally, while I take no position as to whether prior to staging the "Vitale" fantasy the Special Prosecutor had sufficient reason to conduct an inquiry into appellant's possible connection with corruption in the criminal justice system in Kings County, no evidence in that regard is discernible from a reading of the Extraordinary Grand Jury minutes (cf. *People v Isaacson,* 44 NY2d 511). We note that a Grand Jury need not demonstrate any reason for investigating anyone.

█ At no time during the Extraordinary Grand Jury presentation did the prosecutors attempt to establish that appellant's conversation with Vitale about a possible defense to the robbery charge was in any way material to any investigation into corruption of the criminal justice system. Rather, what is evident is that in gross violation of appellant's right to due process, those conducting the proceeding took part in manufacturing a crime that never occurred, and then, before the Grand Jury, tailored their questions to appellant solely to entice and trap him into giving false answers. Since no indication of substantive investigative goals is demonstrated

by the Grand Jury minutes, it is clear that we are confronted with a perjury trap of the type condemned in *People v Tyler* (46 NY2d 251, 262, *supra*). As my eminent former colleague, Justice J. IRWIN SHAPIRO, so aptly and eloquently pointed out in his stirring dissent when this matter was first before this court, and before it was made known to this court that exculpatory evidence had been withheld from the Extraordinary Grand Jury by the Special Prosecutor's office *(Matter of Nigrone v Murtagh,* 46 AD2d 343, 358, *supra):* "[B]ut the singular and undeniable fact is that these defendants in their appearance before the Grand Jury were not asked a single question with regard to any bribes. Instead, the questions they were asked were clearly and purposefully designed to get them to deny what they previously had said—and which was contained on tapes in the possession of the Special Prosecutor —so that they could be threatened with perjury indictments and then be 'squeezed' by him for the bribery information which he sought. Upon the argument of these applications it was admitted that before the hand-up of the instant indictments a conference was held with at least one of the defendants, seeking to accomplish that end."

Perhaps the most damning commentaries as to the true intent of the prosecutors who conducted the Extraordinary Grand Jury proceeding were the spontaneous utterances of two of its members. Troubled by the tenor of what had transpired before them, the first one stated: "It wasn't a question. It was just a statement of judgment that I think was shared by several of us. There is very little doubt that there has been perjury committed. *However, we are supposed to be an anticorruption jury, seeking corruption,* and in this particular case there seems to be very little corruption. Lying, yes. *But it was like a setup to see whether or not a man is going to tell the truth or not.* And it's a very, very difficult thing as far as I'm concerned." (Emphasis supplied.) A second grand juror thereafter reflected: "I think what's bothering some of the jurors—I may be wrong—is the connotation here that a trap was set. Is that true? Entrapment, I guess they call it."

It is to be hoped that this sorry episode of prosecutorial assault upon our institutions is coming to an unlamented end. It has stained not only the office from which it emanated but has also tended to taint unjustifiably and undeservedly all others who prosecute wrongdoers while observing a sense of decency and respect for the law. Tactics such as those demon-

strated by this record if not checked, are certain to encourage lawlessness and destroy cherished freedoms *(People v Isaacson,* 44 NY2d 511, 524, *supra).* As the late Mr. Justice BRANDEIS so brilliantly and with great prescience, stated in his historic dissent in *Olmstead v United States* (277 US 438, 485): "Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

A person charged with or suspected of the most heinous of crimes is still entitled to the fundamental fairness encompassed by the notion of due process *(People v Isaacson, supra,* p 524). "Vigilante Justice" is abhorrent to our concept of jurisprudence whether the end product be a body dangling from a rope, or a person charged with a crime as a result of lawless conduct on the part of an overzealous prosecutor. The latter indeed is reprehensible since both society and the accused are victimized by one sworn to uphold the law.

Accordingly, the judgment of conviction should be reversed and the indictment dismissed.

MOLLEN, P. J., and GIBBONS, J., concur; COHALAN, J., dissents and votes to affirm the judgment.

Judgment of the Supreme Court, Kings County, rendered March 22, 1978, reversed, on the law, indictment dismissed, and case remitted to the Supreme Court, Kings County, for the purpose of entering an order in its discretion pursuant to CPL 160.50.