(October 3, 1984)

■ In the Matter of BRIAN F. MALONE, an Attorney, Respondent. COMMITTEE ON PROFESSIONAL STANDARDS, THIRD JUDICIAL DEPARTMENT, Petitioner. — Petitioner moves to confirm a referee's report which sustained, in part, a charge of professional misconduct against respondent. Respondent, an attorney admitted in the Second Department on March 16, 1966, cross-moves to disaffirm the report.

The single charge against respondent arises out of his conduct of an investigation, as Inspector General of the New York State Department of Correctional Services, into the alleged brutal beating of an inmate by several correction officers. Specifically, in order to protect the identity of a correction officer who stated he witnessed the incident, and thus protect him from retaliation for having broken the "code of silence" among correction officers, respondent instructed the officer to testify falsely under oath at one point during the investigation.

In December, 1980, Correction Officer Robert Lewis confidentially informed his superiors that he had witnessed an unprovoked assault upon inmate Robert Jackson by several correction officers which occurred on December 13, 1980 at the Downstate Correctional Facility in Dutchess County. Testimony before the referee, including that of the Commissioner of the Department of Correctional Services, indicated that it is highly unusual for a correction officer to voluntarily inform upon his fellow officers for fear of retaliation for breaking the "code of silence" which exists among correction officers.

Respondent began an investigation into Lewis' allegations. Preliminary interviews of Lewis by respondent and his investigators to ascertain Lewis' version of events and his credibility

were conducted at the Dutchess County Airport. The interviews were conducted at the airport as part of a policy decision by respondent, condoned by the commissioner and Lewis, to keep Lewis' identity as an informer secret as long as possible. Some additional information gathered during this period, such as inmate Jackson's statement and his medical records, appear to support Lewis' version of the events surrounding the assault.

Thereafter, on October 21, 1981, at the Downstate Correctional Facility, as part of the ongoing investigation, respondent interviewed under oath the correction officers who had been identified as possibly involved in the alleged beating of inmate Jackson. Six correction officers, including Lewis, were interviewed. The purpose of the interviews was to gather evidence and to have the officers make sworn statements regarding the incident. None of the officers admitted participating in or observing an assault upon the inmate.

Lewis also denied having witnessed the use of undue force. This false testimony was given at respondent's direction. By having Lewis give false testimony exonerating his fellow officers, respondent hoped to avert suspicion away from Lewis as an informer. The ruse was successful.

The day before the interviews, on October 20, 1981, at the Quality Inn in the City of Albany, respondent had taken Lewis' true testimony under oath as to the incident in the presence of a stenographer and investigator. At that time, respondent stated on the record the plan of taking two contradictory statements from Lewis "in order to preserve the confidentiality of his information and his identity". The transcript of Lewis' October 20, 1981 testimony does not reveal Lewis' identity and is entitled "Interview with 'Witness' Correction Officer". After the fact, respondent informed the commissioner and the department's chief legal counsel of Lewis' contradictory statements; both approved of the procedure.

On December 11, 1981, disciplinary charges were brought against three of the correction officers interviewed by respondent on October 21, 1981, alleging the use of undue force and giving false testimony. Negotiations ensued between the department and the officers' union in an effort to settle the charges. During these negotiations, respondent provided the department negotiators with Lewis' October 20, 1981 true statement to use as leverage or a bargaining chip. The negotiations proved unsuccessful, the accused correction officers filed grievances and arbitration was initiated.

On the first day of arbitration, October 4, 1982, Lewis was called as a witness, testified to the use of undue force, and

revealed the contradictory nature of his two prior statements and respondent's role with respect thereto. Had the matter never gone to arbitration, Lewis' identity would have remained secret.

On September 22, 1983, petitioner Committee on Professional Standards charged respondent with professional misconduct in violation of DR 1-102 (subd [A], pars [3], [4], [6]) of the Code of Professional Responsibility and section 487 of the Judiciary Law in that "he counseled and instructed a witness to give contradictory, misleading and inconsistent testimony and attempted to mislead and deceive a party or parties". The charge detailed two specifications, the facts of which were admitted by respondent, which essentially described his role in the taking of Lewis' statements on October 20 and 21, 1981. After a hearing on January 20, 1984 before a referee assigned by this court, the referee found respondent had violated DR 1-102 (subd [A], par [4]) by engaging in conduct involving deceit and misrepresentation and found respondent's proffered justifications for his action relevant only to the degree of discipline to be imposed.

In support of his cross motion for disaffirmance of the referee's report, respondent first argues that this court is without jurisdiction in this matter because he was not admitted in, does not reside in, and has never practiced law in this Department. We reject his contention. This court's disciplinary jurisdiction extends to New York attorneys who have offices in or are employed or transact business in this Department (see Judiciary Law, § 90, subd 2; 22 NYCRR 806.1; *Matter of Smith,* 68 AD2d 52, 53); as Inspector General of the State Department of Correctional Services, respondent has one of his main offices in Albany. Also, the fact that some of the alleged misconduct, such as respondent's direction to Lewis at the Quality Inn in Albany to testify falsely, took place in this Department is an additional valid jurisdictional ground (see *Matter of Klein,* 23 AD2d 356, 360, affd 18 NY2d 598, cert den *sub nom. Klein v Klein,* 385 US 973).

Next, we reject respondent's argument that since he was acting in his role as Inspector General and not as an attorney when he advised Lewis to lie under oath, this court may not discipline him for such misconduct. It is clear that this court's power to discipline an attorney "extends to misconduct other than professional malfeasance when such conduct reflects adversely upon the legal profession and is not in accordance with the high standards imposed upon members of the Bar" (*Matter of Nixon,* 53 AD2d 178, 181-182; see Judiciary Law, § 90, subd 2; 22 NYCRR 806.2; *Matter of Dolphin,* 240 NY 89, 93). Directing a person to give false testimony would normally constitute such

misconduct (see *Matter of Popper,* 193 App Div 505, 512; see, also, *Imbler v Pachtman,* 424 US 409, 429; Disciplinary Action Against Attorney for Misconduct Related to Performance of Official Duties as Prosecuting Attorney, Ann., 10 ALR4th 605). Holding a public office, such as Inspector General, is not a shield behind which breaches of professional ethics, otherwise warranting disciplinary action, are permitted. Rather, a lawyer who holds public office must not only fulfill the duties and responsibilities of that office, but must also comply with the Bar's ethical standards.

Respondent argues that, under the circumstances of this case, his direction to Lewis to falsely testify was not a breach of ethical principles because it was in accordance with certain ethical canons, that there is precedent for the proper use of false testimony in the investigative and prosecutorial context, that the motive of protecting Lewis from danger justified the breach, if any, that respondent was under a duty to protect Lewis, that respondent's actions are justifiable under section 35.05 of the Penal Law, and that respondent should enjoy immunity for a good-faith discretionary act.

First, we conclude that the ethical canons cited by respondent in support of his conduct, requiring competent and zealous representation of clients, cannot in and of themselves overcome the proscription against directing another to give false testimony. Second, while there is precedent for the proposition that the creation and use of false documents and testimony in the investigative and prosecutorial context may not be so violative of due process and a defendant's fundamental rights as to warrant dismissal of a criminal indictment (see *People v Archer,* 68 AD2d 441, affd 49 NY2d 978, cert den 449 US 839), such conduct may, nevertheless, be unethical (cf. *United States v Archer,* 486 F2d 670; *People v Rao,* 73 AD2d 88).

Respondent's argument that his conduct was not unethical because it was motivated by a desire to protect Lewis and prompted by his responsibilities as Inspector General is essentially a contention that the end justifies the means. This argument was properly rejected by the referee who relied upon *Matter of Friedman* (76 Ill 2d 392, 392 NE2d 1333) and *Olmstead v United States* (277 US 438, 485 [Brandeis, J., dissenting]; see, also, *Matter of Zanger,* 266 NY 165; Disciplinary Action Against Attorney for Misconduct Related to Performance of Official Duties as Prosecuting Attorney, Ann., 10 ALR4th 605). We also note that it is not entirely clear the "means" chosen by respondent to protect Lewis' identity was the only alternative available. The department legal counsel testified before the referee

that possible alternatives might have included the taking of statements from the correction officers in a manner which would not have revealed what any of the guards testified to, or the use of some sort of witness protection program.

Next, we reject respondent's contention that his conduct was justified pursuant to subdivision 1 of section 35.05 of the Penal Law because it was "performed by a public servant in the reasonable exercise of his official powers, duties, or functions". While the defense of justification may relieve respondent of criminal liability (cf. *People v Archer,* 68 AD2d 441, 448, *supra;* see, generally, *People v Mattison,* 75 AD2d 959) or civil liability (cf. *Sindle v New York City Tr. Auth.,* 33 NY2d 293), the defense does not necessarily render his actions ethical or even in accord with due process strictures (see *Matter of Friedman, supra* [Underwood, J., concurring]).

Lastly, we also reject respondent's argument that as a public official exercising prosecutorial and investigative discretion he should be immune from disciplinary action. In one of the cases cited by respondent, which deals with the immunity of public officials from being held liable in damages for their actions, the Supreme Court noted: "Moreover, a prosecutor stands perhaps unique, among officials whose acts could deprive persons of constitutional rights, in his amenability to professional discipline by an association of his peers. These checks undermine the argument that the imposition of civil liability is the only way to insure that prosecutors are mindful of the constitutional rights of persons accused of crime" (*Imbler v Pachtman,* 424 US 409, 429, *supra*).

In view of the above, we confirm the referee's report insofar as it found respondent violated DR 1-102 (subd [A], par [4]), "A lawyer shall not: * * * Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." It is not clear whether the referee, by solely mentioning DR 1-102 (subd [A], par [4]) intended to exonerate respondent of violations of other ethical rules. However, we find respondent did not violate DR 1-102 (subd [A], par [3]), "illegal conduct involving moral turpitude", or DR 1-102 (subd [A], par [6]), "any other conduct that adversely reflects on his fitness to practice law". Nor has respondent violated section 487 of the Judiciary Law which states, in pertinent part, that: "An attorney or counselor who: 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party * * * Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

This statute is inapplicable herein because no one is attempting to hold respondent criminally liable or to collect treble damages. This is not to say this court does not have the power to discipline an attorney for acts which may constitute a crime before trial and conviction for such crime (see *Matter of Kammerlohr,* 171 App Div 781, 785; see, also, *Matter of Wall,* 107 US 265; *Matter of Popper,* 193 App Div 505, 511, *supra*).

The purpose of a sanction in a disciplinary proceeding is not to punish but to protect the public, to deter similar conduct, and to preserve the reputation of the Bar (see *Matter of Levy,* 37 NY2d 279, 282; *Matter of Kahn,* 38 AD2d 115, affd 31 NY2d 752; *Matter of Rotwein,* 20 AD2d 428, 429-430; *Matter of Ropiecki,* 246 App Div 80). In view of these purposes, and noting that this is a case of first impression in this State, that respondent appears to have acted out of a laudable motive, namely, to protect a witness willing to risk retaliation for breaking the correction officers' "code of silence", that respondent has had no prior disciplinary problems, and that respondent admitted the facts underlying the charge against him, we find censure to be an appropriate sanction.

Respondent censured. Mahoney, P. J., Main and Weiss, JJ., concur.

Yesawich, Jr., and Levine, JJ., dissent in the following memorandum by Yesawich, Jr., J. Yesawich, Jr., J. (dissenting). We respectfully dissent.

Disciplinary proceedings against an attorney have as their avowed purpose the protection of both the court's integrity and the public interest from those who fail to maintain necessary standards of rectitude and probity (*Matter of Anonymous Attorneys,* 41 NY2d 506; *Matter of Mitchell,* 40 NY2d 153). As we perceive it, respondent's conduct in this instance has not diminished the court's integrity one iota but rather has advanced the public's interest in that an apparent conspiracy by corrupt prison guards concealing the maltreatment of inmates has been exposed (cf. *Matter of March 1975 Monroe County Grand Jury Report,* 52 AD2d 745), and truth, rather than being subverted, has been augmented. Accordingly, we would disaffirm the referee's report and dismiss the petition.

Deceptive behavior by an attorney warrants condemnation when it obscures truth or contravenes the due administration of justice (see, e.g., *Matter of Davidson,* 15 AD2d 327). But not every deception merits punishment, for occasions do arise when the only practicable law enforcement technique is deceit (*United States v Russell,* 411 US 423, 436; see, also, *Sorrells v United States,* 287 US 435, 441). In this respect, the late Chief Justice

Warren observed, "[t]here are some situations when the law could not adequately be enforced without the employment of some guile or misrepresentation of identity * * *. It blinks the realities of sophisticated, modern-day criminal activity and legitimate law enforcement practices to argue the contrary" (*Hoffa v United States,* 385 US 293, 315 [Warren, Ch. J., dissenting]). Indeed, carefully selected use of deception in compelling circumstances has not only been sanctioned, but is seen as not being repugnant to justice (*People v Archer,* 68 AD2d 441, 449, affd 49 NY2d 978, cert den 449 US 839). Given that deception is permissible when its ultimate goal is consistent with legitimate law enforcement objectives, branding respondent as unethical for his conduct in this instance is simply incongruous.

Significantly, the deceit practiced here, that of encouraging Officer Lewis to furnish a false question and answer statement, occurred not in the context of a court proceeding, but in the course of an internal investigation being carried out by members of the Department of Correctional Services. The judicial system was not marred nor was any court adversely affected by the investigative technique employed. In fact, when the matter became adversarial, reaching arbitration, prompt and full disclosure was made to the arbitrator.

Nor did the fabricated statement cause society any mischief; evidence was not manufactured thereby, merely gathered. And the motive for respondent's conduct, to protect Officer Lewis while securing evidence to root out corrupt officials and to thus prevent the prison population from further harm, cannot be faulted for not only is the public interest advanced as a consequence, but truth is revealed. In short, the artifice made use of presented danger to none but those who might be guilty.

Here the compelling circumstances justifying the deception was the need to protect the informant. The record discloses that correction officers who violate the "code of silence" have reason to fear for their lives. In view of the closed, tightly controlled environment these officers work in and the unremitting tension they must necessarily endure (*Wolff v McDonnell,* 418 US 539, 561-562), this was a concern of considerable substance, not to be dealt with lightly. Nor is it clear from this rather sparse record that any practical method of collecting this evidence, other than that adopted by respondent, was available. In fact, the "ethical" alternative suggested by the majority of conducting separate interviews had been followed previously and, by a process of elimination, the cooperating correction officer had been identified, assaulted and forced to leave the State, never to testify.

In our view, given the fact that respondent quite obviously did not act out of sheer lawlessness; that by his conduct he did not intend to deceive, prejudice or injure the court or the public; that the false testimony he advised was never asserted for its truthfulness; that it was used solely to protect the identity of the witness and that it threatened only the alleged participants in a conspiracy to cover up an unprovoked assault, we are unable to say that he acted unethically. Finally, we believe it worthy of mention that the practical but unwholesome effect of censuring respondent may well be the cessation of meaningful investigations of corrupt conduct by similarly engaged lawyers, prosecutors and Judges (cf. *Matter of Friedman*, 76 Ill 2d 392, 403).